George MILLER, Plaintiff–Respondent,

v.

Danny Ray MILLER, Defendant,

and

Tonia Lea Miller, Defendant–Appellant.

No. 18918.

Missouri Court of Appeals,
Southern District,
Division One.

March 22, 1994.

J. Russell Carnahan, Carnahan, Carnahan & Hickle, Rolla, for defendant-appellant.

Bradley H. Lockenvitz, Linn, for plaintiff-respondent.

SHRUM, Judge.

This is a constructive trust case. George Miller (the plaintiff) sued his grandson, Danny Ray Miller (Danny), and Danny's wife, Tonia Lea Miller (Tonia) asking that he be restored the ownership of his home via a constructive trust. The trial court found for the plaintiff, set aside the deed to Danny and Tonia, and adjudged title to the real estate revested in the plaintiff. Tonia appeals.[1] Her single point charges that the evidence was insufficient to support the judgment.

We affirm.

### FACTS

The conveyance from which this litigation emanates occurred on July 20, 1989. On that date Danny used a durable power of attorney given him by the plaintiff in April 1989 to deed the plaintiff's house to Danny and Tonia Miller, husband and wife. Danny testified that he did not consult with the plaintiff, seek his advice, nor get his consent before transferring the real estate to himself and Tonia. He further testified that the plaintiff had no knowledge about the transaction until Danny told him about the deed in approximately June 1991, some two years afterward. Tonia disputes that saying she and Danny discussed with the plaintiff their intentions to transfer the property before the deed was made.[2] The parties agree that no money or other property was given the plaintiff in consideration for the deed.

The plaintiff was age 86 at the time of trial.[3] He and his wife Zella (who is now

---

1. Danny did not answer the plaintiff's petition and does not appeal from the trial court's judgment divesting him of any interest in the real estate.

2. In June or July 1991, Danny and Tonia separated and became embroiled in divorce litigation.

The disposition of what had been the plaintiff's real estate became an issue in their dissolution case. This suit was then filed by the plaintiff.

3. Trial occurred June 2, 1993.

deceased) lived for many years at Belle, Missouri, in the house that is the subject of this suit. Beginning in the early 1980's and until her death, Zella could neither walk nor fully care for herself because of injuries she sustained in an accident. At first, the plaintiff alone cared for his wife. However, as time passed Zella's health gradually worsened, as did the plaintiff's. Finally, in 1988 or 1989 (the record is unclear), the plaintiff could no longer care for himself or Zella and they moved to a nursing home. Zella died May 17, 1989.

The plaintiff had "essentially raised" Danny. Their relationship was always "very good," "excellent." He was "closer" to Danny than he was to his other relatives. In the "late '80's," especially after the plaintiff entered the nursing home, he began having difficulty in managing his affairs. The plaintiff attributed his difficulty in this regard to his bad health. Danny said it was because his grandfather was "tired." Moreover, as described by Danny, the plaintiff "didn't understand everything about the business of the hospitals and nursing homes and all that." The plaintiff explained his need for Danny's help as follows: "[I was] in and out of the hospital and to the doctors ... [and Danny's actions in] taking care of my bills, keeping them all paid ... helped a lot." Consequently, the plaintiff came to rely upon Danny for help and advice concerning business matters. It was Danny that the plaintiff depended on and not other relatives. The plaintiff testified that he trusted Danny, trusted his judgment, and followed "[Danny's] advice in business or legal matters."

In April 1989 Danny had a lawyer prepare a durable power of attorney by which the plaintiff gave Danny general power over all of his affairs, including authority to convey any of the plaintiff's real estate "which [the plaintiff's] attorney considers necessary or in [the plaintiff's] best interests...." Danny took the power of attorney to the plaintiff who signed it on April 25, 1989.[4] After that, on July 20, 1989, Danny used the power of attorney to convey the plaintiff's property to himself and Tonia.

Two years later, when Danny first told the plaintiff about the transfer, he said it was done "to protect [the property] and take care of it for as long as [the plaintiff] needed it." At trial Danny explained his reason for making the deed thus:

"[M]y grandparents were going into a nursing home. My father, his son, was an alcoholic in the worst way, and he was around Belle at that time. And I feared that if there was no one looking out for the property, that my dad would have it destroyed in a short amount of time."

Upon cross-examination Danny explained further:

"I took it on myself to transfer the property to my name so that I would have some recourse when—my grandfather wasn't around at that time since he was in the nursing home—that I would have some, I thought, legal recourse to stop anyone from being on the property.

Q. (To Danny) But in particular it was to protect the property from your father, right?

A. Yes."

Continuing, Danny testified:

"Q. And you've allowed your grandfather to continue living there and have agreed to let him live there for the rest of his life, isn't that right?

A. When he decided to come out of the nursing home, it was just understood that it was his home to go back to.

Q. And you and your wife have always treated it that way.

A. As his.

Q. And you'd agreed to let him live there the rest of his life, hadn't you?

A. I don't feel that I have that say. I feel that the property by all rights is his. It's legally mine so that I could care for it when he wasn't able to.

. . . .

Q. At any time did you ever intend this transfer to be permanent?

A. No."

---

4. Although Zella did not die until May 17, 1989, the record does not reflect why on April 25, 1989, there was no power of attorney obtained from her.

The plaintiff confirmed that his son, Bill Miller, "was an alcoholic" who caused him "all kinds of trouble." He testified as follows:

> "[My son would] drink that stuff and bring his buddies in there, and they'd run around in there and drink and smoke and probably set fire to the property. And after they would stay in there awhile, all his friends would gang in there and tear up the property and probably burn it down.
>
> . . . .
>
> He'd get on them big rounds and he'd come in and he'd steal everything he could get his hands on, and he stole probably over $500 worth of tools out of my shop, take them and peddle them out to buy another bottle."

Tonia testified that "the purpose of the transfer was to protect the [plaintiff's] property from the [plaintiff's son, Bill Miller]." She told the trial court that the plaintiff's real estate had "always kind of been an issue" in the family because "Bill [Miller] had always been a problem." She described the plaintiff's son as a "very bad alcoholic" who "just kind of migrated down to [the plaintiff's] house and gave [the plaintiff] trouble all the time, to the extent that we had to commit him to Fulton once." Continuing, Tonia testified that following Bill Miller's release from Fulton, he eventually came "back to Belle and gave [the plaintiff] more trouble." Tonia further testified that when Danny signed the deed, the plaintiff "was ill," "run-down [from] trying to take care of Zella," and "was just so depressed and sick, we . . . thought he was not going to live much longer."

At the time of trial, the plaintiff's son, Bill Miller, was dead and the plaintiff had resumed living in his home.[5] The parties did not use Rule 73.01(a)(2) to request the trial court to file a "statement of the grounds for its decision" or that it make findings on "controverted fact issues." In part, the judgment reads:

> "2. The conveyance of real property . . . executed by . . . Danny . . . as attorney-in-fact for the Plaintiff was done for the purpose of preventing Plaintiff's son from inheriting said property at a time when Plaintiff was gravely ill.
>
> 3. That thereafter said son died and the Plaintiff recovered.
>
> 4. That there remains no further reason for said conveyance to remain in effect absent Plaintiff's wishes.
>
> 5. That thereafter . . . Tonia . . . refused to reconvey said property to Plaintiff.
>
> 6. The Court finds a constructive trust in favor of Plaintiff."

## STANDARD OF REVIEW

■ Our standard of review in a constructive trust case, as in other court tried matters, is determined by Rule 73.01. We will affirm the judgment of the trial court unless there is no substantial evidence to support it, it is against the weight of the evidence, or it erroneously declares or applies the law. *Murphy v. Carron*, 536 S.W.2d 30, 32[1] (Mo. banc 1976); *Imgrund v. LaRue*, 851 S.W.2d 40, 43 (Mo.App.1993). We defer to the credibility determinations made by the trial court, and we accept as true the evidence and permissible inferences favorable to the prevailing party and disregard contrary evidence and inferences. *Kahn v. Royal Banks of Missouri*, 790 S.W.2d 503, 505 (Mo.App.1990). "All fact issues upon which no specific findings are made shall be considered as having been found in accordance with the result reached." Rule 73.01(a)(2).

■ To establish a constructive trust, an extraordinary degree of proof is required. *Fix v. Fix*, 847 S.W.2d 762, 765[1] (Mo. banc 1993). The evidence must be so clear, cogent, and convincing as to exclude every reasonable doubt. *Id.*

## DISCUSSION AND DECISION

Tonia contends that the evidence was not sufficient to meet the extraordinary degree of proof required to establish a constructive

**5.** The date that Bill Miller died is not found in this record, other than the plaintiff testified on June 2, 1993, that his son died "in July." The date that the plaintiff returned to live in his house is likewise unclear, except that he did so before Danny and Tonia separated.

trust in land. We summarize the reasons she offers for this assertion:

(1) The plaintiff's testimony regarding his relationship with and trust in Danny was ambiguous and in conflict to the point that it failed to show a confidential relationship between the plaintiff and Danny.

(2) There was no evidence that Danny had a coercive influence on the plaintiff greater than that of a regular family relationship.

(3) There was no evidence that Danny and Tonia would be unjustly enriched by the transaction; "[t]o the contrary, there is sufficient evidence for the trial court to have found that Plaintiff intended Danny and Tonia to receive the interest in the property ... conveyed to them."

(4) There was no evidence that a promise made during a confidential relationship was breached.

(5) There was no evidence that the property transfer was made in contemplation of the plaintiff's death and no evidence that it was intended to be a substitute for a testamentary disposition.

That Tonia's various lines of argument are without merit is explained by applying the following rules of law to the facts shown.

"[A] constructive trust is the method or formula used by a court of equity [for] ... effecting restitution or of rectifying a situation where, [because of] ... the violation of confidence or faith reposed in another, ... the plaintiff, who seeks the aid of equity, has been wrongfully deprived of, or has lost, some title...." *Suhre v. Busch,* 343 Mo. 679, 123 S.W.2d 8, 15[3] (1938); *Neal v. Sparks,* 773 S.W.2d 481, 486[3] (Mo.App. 1989). The object of a constructive trust is to restore to the rightful owner the property wrongfully withheld by defendants. *Fix,* 847 S.W.2d at 765[4].

The rule applicable to this case is stated succinctly in *Swon v. Huddleston,* 282 S.W.2d 18, 25–26[9] (Mo.1955) (citations omitted):

"If a fiduciary or confidential relationship exists between the alleged trustee and the beneficiary, no proof of fraud is necessary in order to establish a constructive trust. It seems that this exception is based upon the principle that a breach of confidential relationship is, in itself, a constructive fraud."

*See also Sassenrath v. Sassenrath,* 624 S.W.2d 77, 81 (Mo.App.1981), *Mahler v. Tieman,* 550 S.W.2d 623, 628[6, 7] (Mo.App. 1977), 5 Scott on Trusts § 462, at 302 (4th ed. 1989).

■ A fiduciary or confidential relationship exists whenever one trusts in and relies on the other. *Thompson v. Williams,* 671 S.W.2d 442, 445[2] (Mo.App.1984). To prove such a relationship, there must be evidence of a special trust with respect to property or business. *Id. See also Wilhoit v. Fite,* 341 S.W.2d 806, 813[5–6] (Mo.1960).

■ From the record, it is clear the plaintiff had great trust in Danny and needed someone to conduct his business affairs and manage his property when his infirmities made it impossible for him to do so. The record does not reveal any mental incapacity for the plaintiff but establishes substantial progressive physical infirmity. The evidence clearly shows that the power of attorney was given to enable Danny to conduct the plaintiff's business affairs. The power of attorney empowered Danny to convey the real estate only if Danny deemed it "necessary or in [the plaintiff's] best interest." That language supports the inference and conclusion that this conveyance, which appears to be absolute on its face, was made so that Danny might protect the plaintiff's property from being occupied and damaged by Bill Miller. The evidence in the record makes it abundantly clear that the plaintiff had complete trust in Danny to manage his financial affairs and property and gave him power and authority to do so. Danny's relationship to the plaintiff was as fiduciary. Tonia's argument to the contrary is rejected.

■ The constructive trust remedy is not confined to instances where undue influence is alleged. *See Imgrund,* 851 S.W.2d at 44. It is instead "best understood as an equitable remedy used in a variety of circumstances to set aside wrongful ownership gained through real or constructive fraud." *Id.* The question here is not whether Danny, while in a confidential relationship, exerted

undue influence over the plaintiff to cause him to execute the power of attorney. Rather, this case is akin to *Thompson*, 671 S.W.2d 442, in that "[i]t deals with actual breach of the fiduciary obligation regardless of the circumstances which created the relationship in the first place." *Id.* at 445. The question presented is not whether Danny exerted undue influence to achieve his control over the plaintiff's home but, rather, whether his exercise of that control, once achieved, was in breach of his fiduciary obligations. *Id.* It is of no consequence that the plaintiff offered no evidence tending to show that Danny coerced the plaintiff into signing the power of attorney.

There can be no question that Danny's conveyance of the plaintiff's property was in breach of his fiduciary obligations if the transaction is viewed as Tonia contends. Danny, as an attorney in fact, was only an agent, not an independent actor who could do as he wanted with the principal's property. When Danny elected to use the power of attorney, he was under a duty, imposed by the "Durable Power of Attorney Law of Missouri," §§ 404.700–404.735 RSMo Supp.1991, to act as a fiduciary. He was required to exercise good faith, act in the principal's best interests, follow the principal's oral and written directions, avoid conflicts of interest, and communicate with the principal. *See* §§ 404.710.1, 404.710.5, 404.714.1, and 404.-714.2.[6] He was required to "exercise the authority granted ... with that degree of care that would be observed by a prudent person dealing with the property ... of an-

other." § 404.714.1. Section 404.712.1 required that Danny keep the plaintiff's property separately identified and distinct from his property. Absent from the power of attorney was any clause that "expressly enumerated and authorized" Danny to make a gift of the plaintiff's property or change the survivorship rights to the property. *See* §§ 404.710.6(3), (5) and (6).[7] Not being so empowered, Danny was without authority to convey the property beyond the plaintiff's reach.

The evidence is clear, cogent, and convincing that Danny's relationship to the plaintiff was as fiduciary and that Danny's action in transferring the property to himself and Tonia was a breach of his fiduciary obligations. *Thompson*, 671 S.W.2d at 446. The trial court properly decreed a constructive trust as to the plaintiff's real estate.

Judgment affirmed.

PARRISH, C.J., and MONTGOMERY, J., concur.

---

**6.** Section 404.710.1 in pertinent part reads: "A principal may delegate to an attorney in fact in a power of attorney general powers *to act in a fiduciary capacity* on the principal's behalf with respect to all lawful subjects and purposes." (Emphasis ours.)

Section 404.710.5 mandates that an attorney in fact "exercise the powers conferred according to the principal's instructions, in the principal's best interest, in good faith, prudently and in accordance with sections 404.712 and 404.714."

In part, § 404.714.1 says: "An attorney in fact who elects to act under a power of attorney is under a duty to act in the interest of the principal and to avoid conflicts of interest that impair the ability of the attorney in fact so to act."

Section 404.714.2 provides: "On matters undertaken or to be undertaken in the principal's behalf ... an attorney in fact has a duty to keep

in regular contact with the principal, to communicate with the principal and to obtain and follow the instructions of the principal."

**7.** §§ 404.710.6(3), (5) and (6) direct that:

"No power of attorney ... shall be construed to grant power or authority to an attorney in fact to carry out any of the following actions unless the actions are expressly enumerated and authorized in the power of attorney:

....

(3) To make ... a gift of the principal's property ...;

....

(5) To create or change survivorship interests in the principal's property ...;

(6) To designate or change the designation of beneficiaries to receive any property...."