Letha E. WILLIAMS, Deceased, By Carl
Williams, Personal Representative,
Plaintiff–Appellant,

v.

Floyd R. WALLS and Carletta Walls,
Defendants–Respondents.

No. 21290.

Missouri Court of Appeals,
Southern District,
Division Two.

Feb. 10, 1998.

Motion for Rehearing or Transfer
Denied March 4, 1998.

John Alpers, Jr., Cabool, for plaintiff-appellant.

Jon S. Hutcheson, Houston, for defendants-respondents.

BARNEY, Judge.

Appellant Carl Williams (Carl), personal representative of the Estate of Letha E. Williams, appeals from a judgment of the Circuit Court of Texas County, Missouri.

Carl raises three points of trial court error. First, he contends that the trial court erred and abused its discretion when it denied the imposition of a constructive trust on "funds" belonging to his parents which were transferred to his sister, Respondent Carletta Walls (Carletta) and her husband, Respondent Floyd R. Walls (Ron), after Carletta was appointed their attorney-in-fact under a durable power of attorney signed by their parents, Letha E. Williams (Letha) and Homer O. Williams (Sam).[1] Second, he maintains that the trial court erred in failing to establish a constructive trust on real property conveyed by Letha and Sam to Carletta and Ron by general warranty deed. Carl argues that a constructive trust should have been imposed over the real property because Carletta and Ron exercised coercion, duress and undue influence over Letha and Sam in obtaining title to the real property. Additionally, Carl asserts in his representative capacity, that as a prerequisite to the conveyance, Carletta and Ron were to have made a cash payment of $10,000.00 to Carl, individually, but that this was never done.[2] Lastly, Carl contends that the trial court erred and abused its discretion in refusing to order Carletta to make an accounting on financial

1. This action was originally brought by Letha on June 10, 1993, in six counts, explained below. After her death on October 15, 1993, by agreement of the parties, on November 2, 1993, Carl was substituted as party plaintiff, in his capacity as personal representative of the Estate of Letha Ellen Williams, deceased. *See* § 537.010, RSMo 1986; § 537.021, RSMo Cum.Supp.1993; *Britton–Paige v. American Health and Life Ins. Co.*, 900 S.W.2d 7, 8 (Mo.App.1995); *Earls v. Farmers Prod. Credit Ass'n.*, 763 S.W.2d 694, 698 (Mo. App.1988); *see also Clark v. Mississippi Valley Trust Co.*, 357 Mo. 785, 211 S.W.2d 10, 17–18

(1948)(wherein a beneficiary's claim against a trustee of a trust for past obligations incurred by the beneficiary for necessary medical treatment, surgery, nursing "being of an equitable nature, survived the beneficiary's death and may now be urged by his executor."); 1 C.J.S. *Abatement and Revival* §§ 119, 132 (1985).

2. Carl is not a party individually to this action. Thus, no issue is raised concerning the payment of $10,000.00 to him.

transactions arising from Carletta's appointment as attorney-in-fact.

## I.

■ "Our standard of review in a constructive trust case, as in other court tried matters, is determined by Rule 73.01." *Miller v. Miller*, 872 S.W.2d 654, 657 (Mo.App. 1994). "We will affirm the judgment of the trial court unless there is no substantial evidence to support it, it is against the weight of the evidence, or it erroneously declares or applies the law." *Id.* (citing *Murphy v. Carron*, 536 S.W.2d 30, 32 (Mo. banc 1976)). "Substantial evidence is that which, if true, has probative force upon the issues, and from which the trier of facts can reasonably decide a case." *Tichenor v. Vore*, 953 S.W.2d 171, 174 (Mo.App.1997). "Weight of the evidence denotes its weight in probative value, not the quantity or amount of evidence." *Id.* "It is not determined by mathematics; rather, it depends on its effect in inducing belief." *Id.*

■ "To establish a constructive trust, an extraordinary degree of proof is required. The evidence must be unquestionable in character. The evidence must be so clear, cogent, and convincing as to exclude every reasonable doubt in the mind of the trial court." *Rackley v. Rackley*, 922 S.W.2d 49, 51 (Mo.App.1996). (citing *Fix v. Fix*, 847 S.W.2d 762, 765 (Mo. banc 1993)). "This Court will also defer to the trial court on factual issues because it is in a better position to not only judge the credibility of witnesses directly, but also their sincerity and character as well as other trial intangibles which may not be completely revealed by the record." *Tichenor*, 953 S.W.2d at 174 (citing *In re Estate of Campbell*, 939 S.W.2d 558, 564 (Mo.App.1997)).

The trial court made extensive findings of fact in a rambling and oft-times confusing fashion. Its conclusions of law contained no case citations or statutory references.

## II.

Sam retired from Caterpillar Tractors of Peoria, Illinois, in 1976. He and his wife, Letha, then moved to a home at 605 Tindel Terrace in Cabool, Missouri. They both received social security benefits, and Sam received a pension from Caterpillar Tractor as well as a Veterans Administration (VA) pension. In 1983, they purchased certificate of deposit 17460 in the sum of $10,000.00 at Cabool State Bank (CSB), and titled it in their joint names. In 1984, they purchased certificate of deposit 18625 in the sum of $10,000.00 at the same institution and also titled that instrument in their joint names. Sam and Letha also maintained checking account 973399 at CSB.

In 1986, Sam and Letha executed separate wills, naming Carletta as personal representative and providing that Carl and Carletta would equally inherit their parents' properties upon the demise of the last spouse. Thereafter, matters became more complicated and convoluted.

In 1987, Carletta and her husband, Ron, and their children were living in Blue Springs, Missouri, a suburb of Kansas City. Carletta was employed at a bank and Ron's work required him to travel. Carl and his family resided in Mobile, Alabama, where he ran an auto parts store.

At the request of her parents, Carletta accompanied them to the Cabool State Bank where Carletta's name was placed as an additional "Depositor" on each of Sam and Letha's certificates of deposit.[3] Carletta's name was also added to Sam and Letha's checking account at CSB, as joint owner.[4] Additionally, Carletta was authorized entry into Sam and Letha's safety deposit box. At that time, the certificates of deposit consisted of their original amounts plus interest that had accrued. The checking account contained approximately $10,289.90. The safety deposit box contained family papers but contained no cash, jewelry or other items of value. According to Carletta, Sam and Letha wanted her name on their checking ac-

---

**3.** Each of the two certificates of deposit contained language directing that the certificate of deposit was made payable to any depositor as joint tenant with right of survivorship.

**4.** The record is devoid of any instrument describing Carletta's status as a "joint owner" of the checking account. This is the language used by the trial court in its findings of fact.

count and certificates of deposit so that she could assist them with their care and to obtain additional benefits from the VA and other agencies.

In 1988, Sam experienced a stroke. Letha was caring for him but was growing very tired. Carletta was traveling to Cabool almost every weekend to be with them. After Sam's stroke, he could not drive and Letha did not drive. With the encouragement of Carletta and her husband, Sam and Letha sold their personal properties and placed the proceeds therefrom in their checking account at CSB and moved to Carletta's family home in Blue Springs, Missouri, sometime during March 1989.

On March 14, 1989, Carletta cashed-in CD 18625 and had the proceeds ($13,993.93) deposited in Sam and Letha's checking account at CSB. In the same month, Carletta also transferred $10,000.00 out of the checking account at CSB and opened up checking account 921890 at Blue Springs Bank (BSB) in the names of Carletta, Letha, and Sam. It is from this account that Carletta asserts most of her parents' future expenses were paid.

Sam and Letha paid no rent or mortgage payments, electric bills, water bills, gasolines, insurance or taxes while staying with Carletta and Ron. Letha would continue to care for Sam, helped with household chores, bought a portion of the groceries and contributed to other expenses. Letha would cash her social security check, approximately $250.00, and use the money for her own purposes and for miscellaneous contributions to the household. When Sam was not in the nursing home, discussed below, he would cash his monthly VA check (about $150.00) for spending money. Sam's other checks were deposited in a checking account, presumably account 973399 at CSB.

Although both Sam and Letha were mentally alert, Sam's health deteriorated due to strokes and he resided in nursing homes for at least 17 months between March 1989 and February 1993. From March 1989 until the time of Sam's death in February 1993, Letha and Sam received approximately $51,700 in retirement income. The trial court's findings of fact reveal that the cost of Sam's medical care, Sam and Letha's living expenses and Sam's funeral bill and gifts to Carl and to Carletta's daughter in the amount of $2,000.00 each, exceeded the sum of the retirement income earned during this period of time. However, we cannot discern either from the record or the trial court's findings of fact whether Sam received any other governmental assistance while in the nursing home or the amount thereof. Nor does the record or the findings of fact reveal what amount of money, if any, that may have been expended out of funds belonging to Sam, Letha or Carletta, in excess of the $51,700.00 of retirement income.

All during this time, Carletta and her husband continued their physical assistance to Carletta's parents. Although Carl would periodically visit his parents and Letha telephoned him weekly, Carl made no other contribution to the support of his parents.

In December 1990, Sam and Letha executed their respective durable powers of attorney, naming Carletta their attorney-in-fact, so that she could take care of "anything that would ever arise." [5]

On February 2, 1991, Carletta transferred the remaining balance of $4,773.51 from Sam and Letha's checking account 973399 at CSB to a new CSB checking account 9458822. This account contained only the names of "Carletta Walls and Floyd R. Walls, P.O.D. Letha Williams." [6]

---

5. The durable power of attorney gave extensive powers to Carletta in the handling of Sam and Letha's assets, including the power to "open and/or close bank accounts * * * [and] create, change or terminate survivorship interests in any property in which I may have an ownership interest." *See generally* §§ 404.700–.735.

All statutory references herein are to RSMo Cum.Supp.1990, unless otherwise indicated.

6. *See* Missouri's Nonprobate Transfer Law. §§ 461.003–.081. Section 461.028.2 defines the abbreviation P.O.D. or POD as "pay on death to." "A transfer on death direction transfers the owner's or surviving joint owner's interest in the property to the designated beneficiaries who survive, effective on the owner's or surviving joint owner's death, if the property is registered in beneficiary form prior to the death of the owner

Also on February 2, 1991, Carletta cashed in CD 17460 at CSB and purchased new CD 21553 at CSB with a face value of $18,616.92. The new certificate of deposit was titled in the name of "Carletta Walls or Floyd R. Walls, P.O.D. Letha Williams."

On February 7, 1992, Carletta purchased CD 21975 at CSB with part of the proceeds from a cashier's check drawn on BSB account 937819, standing in the name of Carletta and her husband. This cashier's check was made payable to Carletta, exclusively, in the amount of $33,702.11. Neither the record nor the findings of fact clearly show the source of these particular funds. As best as can be gleaned from the record, however, this amount was partially derived from the proceeds of CD 18625 at CSB, previously cashed in and transferred to BSB account 937819. The proceeds from CD 18625 were then mixed with money that exclusively belonged to Carletta and her husband. Then, on February 7, 1992, Carletta cashed the cashier's check for $33,702.11 and created new CD 21975 at CSB, with a face value of $20,000.00. It was titled in the name of "Carletta Walls or Floyd R. Walls, P.O.D. Letha Williams." On that same day, the remaining sum from the cashier's check was then deposited in checking account 945822 at CSB, owned by Carletta and her husband.

Early in 1992, Carletta, her husband, Letha and Sam discussed moving back to Cabool, Missouri. At that time, Carletta was earning more than $24,000.00 per year at her bank job in Blue Springs, Missouri. Returning to Cabool would mean that Carletta would lose her job, although her husband continued with his. Sam and Letha offered to deed their home in Cabool to Carletta and

her husband if they would return to Cabool with Sam and Letha. The move subsequently took place and Carletta continued in assisting with the care of her parents. On September 8, 1992, Sam and Letha personally executed their warranty deed, conveying their home in Cabool, Missouri, to Carletta and her husband. There were no restrictions placed on the deed.

Sam died on February 9, 1993. Following Sam's death, the relationship between Letha and Carletta changed. Letha became upset when Carletta and Ron sought to move to a larger home. Letha adamantly refused to move from the home at Tindel Terrace, even after Carletta and her husband did so. It was at about this time that Letha began making accusations against Carletta that Letha had been denied access to her bank records. She also made allegations that Carletta had wrongfully transferred Sam and Letha's funds without their knowledge and permission. Letha then engaged an attorney, made a will leaving all her possessions to Carl and withdrew approximately $15,000.00 from CSB checking account 945806, standing in the name of Sam, Letha and Carletta. Letha then transferred these funds to a separate account showing Letha and Carl as joint owners.[7] Letha then commenced this action in six counts against Carletta and her husband.[8] After Letha's deposition was taken in support of her suit, she became ill, was hospitalized and died in a nursing home on October 15, 1993. Carl then paid Letha's funeral bill from CSB checking account 945806 and retained sole ownership of the remaining proceeds of the funds in that account after paying his and Letha's attorney fees.[9]

or last to die of two or more joint owners." § 461.028.4.

7. Neither the record nor the trial court's findings of fact reveal how these funds entered CSB checking account 945806.

8. In Counts I and II she sought to impose constructive trusts over the proceeds of certificates of deposit 17460, 21553 and 21975 at Cabool State Bank. In Count III she sought to impose a constructive trust on the proceeds of certificate of deposit 18625 at Cabool State Bank, which subsequently was deposited in checking account number 194582201 [945822] at Cabool State

Bank. In Count IV she also sought an accounting with a view to the imposition of a constructive trust over the assets mentioned in Counts I, II and III. Additionally, in Count V she prayed for an imposition of a constructive trust over real estate that she and her husband had transferred to Carletta and, lastly, in Count VI, she sought actual and punitive damages for "wrongfully taken possession of the funds and property."

9. The trial court determined that in August 1993, the checking account contained $16,591.45. Carletta and her husband retained no interest or control over these funds in April of 1993, when Letha transferred them into a separate account,

The record shows that Carletta and her husband are now joint tenants with right of survivorship of two certificates of deposit at "Great Southern Savings" in Cabool, Missouri. On January 27, 1996, certificate of deposit 2341024715 had a balance of $23,591.59. On February 2, 1996, certificate of deposit 2316027909 had a balance of $23,546.12. The trial court determined that the genesis of these two certificates of deposit arose from Sam and Letha's two certificates of deposits, 17460 and 18625. Neither the record nor the trial court's findings of fact reveal the disposition of the $4,773.51 that was transferred from Sam and Letha's CSB checking account 973399 to CSB checking account 9458822.

### III.

We glean from the argument section of Carl's brief that he complains that Carletta breached her fiduciary duty to her parents when she transferred three separate funds belonging to her parents to herself and her husband, after she was appointed attorney-in-fact under her parents' durable power of attorney. In particular, Carl complains that in February of 1992, three separate funds were treated in this fashion, to-wit: (a) the transfer of $4,773.51 from a checking account standing exclusively in the names of Sam and Letha to a checking account standing in the names of Carletta and her husband, P.O.D. Letha Williams; (b) cashing in CD 17460 previously belonging to his parents, to which Carletta's name had been added, and creating new CD 21553 titled in Carletta and her husband's name, P.O.D. Letha Williams; and (c) cashing in CD 18625, previously belonging to his parents, to which Carletta's name had been added, and eventually creating new CD 21975 titled in Carletta and her husband's name, P.O.D. Letha Williams.[10]

Carletta counters that because her parents placed her name as an owner of the two certificates of deposit *prior* to being appointed their attorney-in-fact, she had absolute discretion as a joint owner to dispose of the funds as she saw fit because no restrictions were placed on withdrawals from those accounts. She cites section 362.470 in support. It provides, in pertinent part, that:

> **Joint deposits.**–1. When a deposit is made by any person in the name of the depositor and any one or more other persons ... as joint tenants or in form to be paid to any one or more of them, or the survivor or survivors ... the deposit thereupon and any additions ... shall become the property of these persons as joint tenants, and the same, together with all interest thereon, shall be held for the exclusive use of the persons so named, and may be paid to any one of such persons during his lifetime, or to any one of the survivors.... The making of a deposit in such form, and the making of additions thereto, in the absence of fraud or undue influence shall be conclusive evidence in any action or proceeding ... to vest title to the account and the additions thereto and all interest thereon in the survivor.

§ 362.470.1, RSMo 1986.[11] Further, she maintains that under the powers granted to her by her parents' durable power of attorney she was authorized to take the action that she did. We disagree.

"The object of a constructive trust is to restore to the rightful owner the property wrongfully withheld...." *Miller*, 872 S.W.2d at 658. "Either actual or constructive fraud is sufficient to support imposition of a constructive trust." *Rackley*, 922 S.W.2d at 51. A trial court may also impose

showing herself and Carl as joint owners. The balance of these funds were not inventoried in Letha's estate and Carl admits retaining these proceeds. Carletta makes no claim against these funds. Essentially, she contends that Carl's retention of these funds should compensate him for any claim he may have arising from her being conveyed their parents' home.

**10.** As previously mentioned, two certificates of deposits now stand in the name of Carletta and her husband at Great Southern Savings at Ca-

bool, Missouri, apparently derived partially from certificates of deposit numbered 17460 and 18625 at the Cabool State Bank.

**11.** *See* § 369.174.1, the counterpart to § 362.470.1, for joint tenants' accounts in savings and loan associations. "For the convenience of the public, financial institutions, and the bar, courts should interpret these two statutes similarly." *Maudlin v. Lang*, 867 S.W.2d 514, 516 (Mo. banc 1993).

a constructive trust when a party has been unjustly enriched. *Estate of Davis,* 954 S.W.2d 374, 379 (Mo.App.1997). "Courts have equated constructive fraud with the breach or violation of a fiduciary, or confidential, relationship." *Rackley,* 922 S.W.2d at 51. "A confidential relationship exists when one person relies upon and trusts the other with the management of his property and attendance to his business affairs, thereby creating some degree of fiduciary obligation." *Paletta v. Mercantile Bank, N.A.,* 889 S.W.2d 58, 61 (Mo.App.1994). "A fiduciary or confidential relationship exists whenever one trusts in and relies on the other." *Miller,* 872 S.W.2d at 658. "To prove such a relationship, there must be evidence of a special trust with respect to property or business." *Id.* "A confidential, or fiduciary, relationship is not proven merely by a showing that the persons have ties of blood or family. But, family and blood ties are factors to be considered in determining whether such a relationship exists." *Rackley,* 922 S.W.2d at 51; *see also Hodges v. Hodges,* 692 S.W.2d 361, 377 (Mo.App.1985).

As a general rule, "any party attempting to impose a constructive trust on account proceeds on the basis of the intent of the depositor will be foreclosed from relief, except in cases of fraud, undue influence, mental incapacity or mistake." *Estate of Hayward,* 884 S.W.2d 10, 14 (Mo.App.1994). *Miller,* however, teaches that "[i]f a fiduciary or confidential relationship exists between the alleged trustee and the beneficiary, no proof of fraud is necessary in order to establish a constructive trust." *Miller,* 872 S.W.2d at 658(quoting *Swon v. Huddleston,* 282 S.W.2d 18, 25–26 (Mo.1955).) "It seems that this exception is based upon the principle that a breach of a confidential relationship is, in itself, a constructive fraud." *Id.* Nevertheless, a party desiring to impose a constructive trust must show actual or constructive fraud by evidence that is clear, cogent and convincing as to exclude every reasonable doubt in the mind of the trial court. *Estate of Hayward,* 884 S.W.2d at 14. "Proof of constructive fraud depends necessarily upon the actual circumstances of each case." *Fix,* 847 S.W.2d at 765. Constructive fraud may be proven by a showing "that the

decedent made disposition of the property in question in reliance upon an agreement, express or implied, to handle the money in a certain fashion, and a subsequent breach of that agreement." *Estate of Hayward,* 884 S.W.2d at 14; *see also Fix,* 847 S.W.2d at 767. Thus, for example, in "testamentary circumstances a constructive trust may be imposed when the named devisee either expressly promises or by silence implies that he will perform in accord with an agreement with grantor or testator." *Estate of Davis,* 954 S.W.2d at 382.

Reviewing the foregoing case law as a background to the facts in the instant matter, we determine that the trial court misapplied the law by not imposing a constructive trust on the three mentioned funds.

The record clearly, cogently and convincingly establishes that in 1987 Sam and Letha placed Carletta's name on their certificates of deposits and checking account for the purposes of having Carletta assist them in managing their financial affairs. The evidence clearly shows that Sam's entry into a nursing home appeared to be imminent in view of his failing health and Letha's advanced age and growing inability to manage their financial affairs.

The trial court's findings of fact state that "Sam and Letha wanted their property transferred to the ownership of Carletta *in order that Carletta would assist them with care for them and in order to obtain additional benefits from the Veteran's Administration or other agencies.*" (emphasis added).

The trial court further found that "Carletta's parents resources were limited and *they wanted them placed with Carletta who would be available to care for them and provide assistance to them. Funds remaining in Sam and Letha's ownership would be rapidly expended for Sam's nursing care.*" (emphasis added).

The foregoing findings cannot be interpreted to mean that Carletta received these assets as a gift. *See In re Estate of Campbell,* 939 S.W.2d 558, 562–63 (Mo.App.1997). It is clear that Sam and Letha relied upon an implied agreement with Carletta that she

was to use the funds for her parents' benefit. *See Estate of Hayward,* 884 S.W.2d at 14.

In 1987, prior to Sam and Letha's execution of their durable power of attorney (in 1990), making Carletta their attorney-in-fact, Carletta's parents placed her name on their certificates of deposits and checking account so that she could assist them with their financial affairs. A confidential relationship sprang into being, because the evidence shows that Sam and Letha placed a special trust in Carletta with respect to their property and finances. *See Miller,* 872 S.W.2d at 658. As such, she acted in a fiduciary capacity *for the benefit* of her *parents. See Estate of Ewing v. Bryan,* 883 S.W.2d 545, 548 (Mo.App.1994).

Carletta has tacitly conceded that she was not the owner of these assets. When her mother complained that she was being denied access to bank records relating to her funds, Carletta acknowledged, in her trial testimony, that she regularly discussed finances with her parents. Carletta stated that her mother "had already seen all the bank statements that had ever come in our house anyway. She always got the mail." Acknowledging Letha's interest in the funds in question, as well as other funds, Carletta testified that "[a]ll she [her mother] had to do was walk up—down the hall and get the—and get whatever she wanted. She had access to everything."

Carletta also agreed that she commenced writing checks on her parents' checking account after August 15, 1987. She acknowledged consulting her parents when writing checks, and she admitted that she wrote them only for the use of her parents. She also acknowledged that it was the intention of her parents in August of 1987, that in the event of both their deaths, she was to equally divide their assets between herself and her brother, Carl.

Carletta further tacitly acknowledged Letha's interest in these accounts when, given the particular circumstances of this case, she made Letha, a lady of advanced age, a contingent beneficiary of these accounts as "P.O.D."

Therefore, when Sam and Letha executed their durable power of attorney making Carletta their attorney-in-fact over their assets, these assets consisted of those accounts to which Carletta's name had already previously been added and Carletta was "under a duty, imposed by the 'Durable Power of Attorney Law of Missouri' . . . to act as a fiduciary." *Miller,* 872 S.W.2d at 659(citation omitted). Carletta "was required to exercise good faith, act in the principal's best interests, follow the principal's oral and written directions, avoid conflicts of interest, and communicate with the principal." *Id.*; *see also* §§ 404.710.1, 404.710.5, 404.714.1–2.

On review of the specific powers contained in Sam and Letha's durable power of attorney, we determine that Carletta was statutorily required to act "with that degree of care that would be observed by a prudent person dealing with the property and conducting the affairs of another." *See* § 404.714.1.[12] This required Carletta to keep her property separately identified and distinct from the property of her parents. *Miller,* 872 S.W.2d at 659. She repeatedly violated this duty when she cashed in Sam and Letha's certificates of deposit and transferred funds from Sam and Letha's checking account to her account, thereby commingling the proceeds therefrom with her own monies. *See* discussion, *supra.*

Further, Carletta violated the prudent person standard and her fiduciary obligations when in 1991 she transferred the proceeds of original certificates of deposits numbered 17460 and 18625, together with checking account 973399 at Cabool State Bank, into joint accounts together with her husband.[13] *See* § 404.714.1.

As a general rule a "gift by an attorney in fact to himself or a third party is

---

**12.** "Prudent" has been defined as "capable of directing or conducting oneself wisely and judiciously; morally or intellectually disciplined; cautious, circumspect, or discreet, as in conduct, choice of ends, or business management; not rash or ill advised; highly sensible; often frugal; provident." *Conroy v. St. Joseph Ry. Light, Heat*

*& Power Co.,* 345 Mo. 592, 134 S.W.2d 93, 95 (1939).

**13.** Carletta argues that her parents knew of these transfers and therefore approved of them. However, at this time it is clear that Sam's health was deteriorating and he was in and out of nursing

barred absent a clear intent to the contrary evidenced in writing." *Arambula v. Atwell,* 948 S.W.2d 173, 177 (Mo.App.1997)(quoting 38A C.J.S. *Gifts* § 13 (1996)).

We are aware that under paragraph "U" of each of her parents' durable powers of attorney, Carletta was authorized "[t]o make or revoke gifts or transfers ... as such attorney may deem appropriate and proper." However, "[i]t is for the common security of mankind ... that gifts procured by agents from their principals, should be scrutinized with a close and vigilant suspicion." *Arambula,* 948 S.W.2d at 177(quoting *Fender v. Fender,* 285 S.C. 260, 329 S.E.2d 430 (1985).) Section 404.710.6 provides, in pertinent part, that:

> No power of attorney ... shall be construed to grant power or authority to an attorney in fact to carry out any of the following actions unless the actions are expressly enumerated and authorized in the power of attorney:
>
> * * *
>
> * * *
>
> (3) To make or revoke a gift of the principal's property in trust or otherwise.

We interpret the foregoing provision as requiring that whenever an attorney-in-fact may make gifts to himself or herself under the foregoing authority, the enabling clause should be "expressly enumerated and authorized." *See* II Mo. GUARDIANSHIP AND TRUST LAW § 13.109 (Mo. Bar 1985, 1987 & 1993). Accordingly, we determine that paragraph "U" of the enabling clause of each of her parents' power of attorney made no express provision for Carletta to make a gift of any of their assets *either to herself or her husband.*

The facts in *Thompson v. Williams,* 671 S.W.2d 442 (Mo.App.1984) parallel this case.

In *Thompson,* decedent was survived by four siblings and a brother-in-law, who were named as beneficiaries of decedent's will. *Id.* at 443. Prior to her death, decedent created several joint accounts and certificates in joint names with her younger brother, Lindsey, Sr. *Id.* at 443–44. She also executed a general power of attorney in his favor and designated him executor of her estate. *Id.* at 444. Both during decedent's life and after her demise, Lindsey, Sr. transferred various funds and assets originally belonging to decedent to the name of Lindsey, Sr. and his wife. *Id.* The trial court in *Thompson* found that there was evidence to support the inference and conclusion that the transfers into joint tenancy were made to enable him to manage her investments for her. *See id.* at 444–45; *see also Estate of Hayward,* 884 S.W.2d at 17. The *Thompson* court held that Lindsey, Sr.'s subsequent actions "in transferring the property to himself and his wife was ... a breach of his fiduciary obligations. The trial court properly decreed a constructive trust existed as to all the property held by Lindsey, Sr. in his fiduciary capacity or transferred by him while acting in such capacity." *Thompson,* 671 S.W.2d at 446.

In the instant matter, when Carletta created new certificates of deposit 21553 and 21975 at CSB and transferred the funds from checking account 973399 at CSB to her and her husband's account, "P.O.D. Letha Williams," Carletta was in violation of her fiduciary obligations imposed by statute. *See Miller,* 872 S.W.2d at 659. Lastly, it is difficult to discern how it was in the best interest of Letha Williams that the bulk of her assets be placed in accounts in which her son-in-law was a joint owner and she was, at most, a contingent beneficiary of her own funds. Carl's point one is well taken.

Because Point Three is logically connected to Point One, we next review Point Three, regarding allegations of trial court error in failing to order an accounting. We determine that this point is also well taken.

homes. Little evidence exists to suggest that either he knew or approved of these transfers. Letha, too, was a lady of advanced age. Further, the record clearly shows that ultimately Letha disapproved of these transfers. She brought suit against Carletta seeking the imposition of a constructive trust on these same funds, alleging that they had been wrongfully transferred because she no longer had an ownership interest in them.

In her deposition, Letha made the following observation regarding the joint accounts where Carletta placed her husband's name on these accounts, payable on death to Letha: " 'Good God, an eighty-year-old woman got to die—you fifty-year-old people got to die before an eighty-year-old woman can get her money?' Everybody in the country laughed, making fun of it."

The Durable Power of Attorney Act "makes provision for review of an attorney in fact's management of the principal's estate." *See Estate of Ewing v. Bryan,* 883 S.W.2d 545, 549 (Mo.App.1994).[14]

 Section 404.727.1 provides that "[t]he principal may petition the court for an accounting by the principal's attorney in fact or the legal representative of the attorney in fact. If the principal is disabled, incapacitated or deceased a petition for accounting may be filed by the principal's legal representative, an adult member of the principal's family or any person interested in the welfare of the principal." § 404.727.1.The term "court" is defined in section 404.703(2) as "the circuit court including the probate division of the circuit court."[15] Since under the statute a principal is required to "petition the court for an accounting," the statute, as at common law, requires a trial court to exercise its discretion in determining whether an accounting should or should not be ordered. "The trial court's exercise of discretion will be overturned only for an abuse thereof." *Ballesteros,* 812 S.W.2d at 220.

There is strong evidence, *supra,* showing that Carletta violated the provisions of section 404.712 which required "[a]n attorney-in-fact ... [to] clearly indicate [her] capacity and shall keep the principal's property and accounts separate and distinct from all other property and accounts in a manner to identify the property and accounts clearly as belonging to the principal." § 404.712. Further, on review of the record, Carletta's attempts at trial to show the disposition of all assets that may have belonged to her parents were anything but clear.

 "An abuse of discretion is found where the ruling of the trial court is 'clearly against the logic of the circumstances then before the court and is so arbitrary and unreasonable as to shock the sense of justice and indicate a lack of careful consideration.' " *In re Marriage of DeWitt,* 946 S.W.2d 258, 261 (Mo.App.1997). We determine that the trial court's refusal to order an accounting in the instant matter constituted such an abuse of discretion. *Id.* Point Three is granted.

 In Point Two, Carl contends that the trial court erred in not imposing a constructive trust over the real property located at 605 Tindel Terrace in Cabool, Missouri.[16] He argues that Carletta and Ron exercised coercion, duress and undue influence over Letha and Sam, resulting in their conveying their home place to Carletta and her husband. In his capacity as personal representative of the estate, Carl also maintains that as a pre-condition to the conveyance of the home to Carletta and her husband that Carl, individually, was to receive a cash payment of $10,000.00 from Carletta and Ron, however, this was never accomplished. We determine that the court did not err in failing to impose a constructive trust on the real property.

The conveyance of the home must be viewed in the context of the early 1992 discussions relating to a possible move by Carletta and her family, together with her parents, back to Cabool, Missouri. The evidence clearly shows that Sam and Letha offered to deed their home to Carletta and her husband if they would return to Cabool with Sam and Letha. The move took place and on or before September 8, 1992, Sam and Letha personally appeared before a notary public and executed their warranty deed conveying their home in Cabool to Carletta and her husband. The evidence shows that there were no restrictions or encumbrances placed on the deed.

**14.** We note that "[w]hen one contributes all the funds deposited in a joint account, so long as that person lives, that person has the power to divest the interests of non-contributing joint tenants by transferring the funds to a new account." *Estate of Munier v. Jacquemin,* 899 S.W.2d 114, 117 (Mo.App.1995). "The 'one who has deposited none of the funds [is subject] to accountability and liability.' " *Id.*

**15.** At common law four elements are required to establish equitable jurisdiction for an accounting:

the need for discovery, the complicated nature of the accounts, the existence of a fiduciary or trust relationship and the inadequacy of legal remedies. *Ballesteros v. Johnson,* 812 S.W.2d 217, 220 (Mo.App.1991).

**16.** The legal description in the deed shows "[a]ll of lots Fifteen (15) and Eighteen (18) in Hillcrest Acres a part of the City of Cabool, Texas County, Missouri."

"Even if the consideration for a deed is inadequate, the operative effect of the deed cannot be defeated in the absence of fraud, mistake, undue influence, or some other recognized equitable ground." *Hay v. Kohl*, 902 S.W.2d 850, 853 (Mo.App.1995).

As heretofore mentioned, to establish a constructive trust, an extraordinary degree of proof is required. The evidence must be clear, cogent, and convincing as to exclude every reasonable doubt in the mind of the trial court. *Rackley*, 922 S.W.2d at 51. The stringency of the proof requirements has been attributed to the public policy in favor of the security of titles and the reluctance of courts to disturb record or other apparent ownership. *Id.* The trial court assessed the credibility of the witnesses and the evidence. *See Tichenor*, 953 S.W.2d at 174. Our review of the record convinces us that Carl failed to produce the clear, cogent and convincing evidence required to sustain his contentions found in his second point. *See Rackley*, 922 S.W.2d at 52. Carl's Point Two is denied.

The judgment denying Count V of the petition is affirmed. The judgment denying Count VI, not having been appealed, is affirmed. The judgment denying imposition of constructive trusts as per Counts I, II and III, as well as an accounting per Count IV, are reversed and remanded to the trial court for further proceedings, to include an accounting. After an accounting, the trial court is ordered to determine what monetary amounts, if any, of the following funds belong in the Estate of Letha E. Williams, to-wit: (a) proceeds from certificates of deposit 17460, 18625, 21553 and 21975 at Cabool State Bank, Cabool, Missouri; (b) certificates of deposit 2341024715 and 2316027909 at Great Southern Savings in Cabool, Missouri; and (c) proceeds from checking account 973399, Cabool State Bank, and checking account 9458822, Blue Springs Bank, Blue Springs, Missouri. Upon due consideration of Counts I, II and III, the trial court is ordered to enter its judgment accordingly.

PARRISH, P.J., and MONTGOMERY, C.J., concur.