**JOHN R. BOYCE FAMILY TRUST, John R. Boyce, Mary Ann Boyce, Daniel P. Boyce, M. Elizabeth Boyce, Emily Ann Boyce and Stephen Pallen Boyce, Plaintiffs/Respondents,**

v.

**Robert B. SNYDER,
Defendant/Appellant.**

**No. ED 82749.**

Missouri Court of Appeals,
Eastern District,
Division Three.

March 2, 2004.

James R. Dankenbring & Erik O. Solverud, St. Louis, MO, for appellant.

Leo V. Garvin & Paul M. Maloney, St. Louis, MO, for respondent.

WILLIAM H. CRANDALL, JR., Judge.

Defendant, Robert B. Snyder, appeals from the judgment, entered in a court-tried case, in favor of plaintiffs, the John R. Boyce Family Trust, John R. Boyce, Mary Ann Boyce, Daniel P. Boyce, M. Elizabeth Boyce, Emily Ann Boyce, and Stephen Pallen Boyce, in their action for removal of the trustee and for damages for the trustee's breach of fiduciary duty. We affirm in part and reverse in part.

In a court-tried case, the judgment of the trial court will be affirmed unless there is no substantial evidence to support the judgment, it is against the weight of the evidence, or it erroneously declares or applies the law. *Murphy v. Carron*, 536 S.W.2d 30, 32 (Mo. banc 1976). We accept all evidence and inferences favorable to the judgment, and disregard all contrary evidence and inferences. *Central Dist. Alarm, Inc. v. Hal–Tuc, Inc.*, 886 S.W.2d 210, 211 (Mo.App. E.D.1994). The trial court is in the best position to judge the credibility of the witnesses. *VanBooven v. Smull*, 938 S.W.2d 324, 327 (Mo.App. W.D. 1997).

The evidence established that the John R. Boyce Family Trust (hereinafter "family trust") was created by the Henrietta Boyce Revocable Living Trust upon the death of Henrietta Boyce in February 1994. The beneficiaries of the trust were John R. Boyce,[1] Henrietta's son; Mary Ann Boyce, Boyce's wife; and their four

---

1. Hereinafter, John Boyce will be the only plaintiff referred to as "Boyce." The other

children, Daniel P. Boyce, M. Elizabeth Boyce, Emily Ann Boyce, and Stephen Pallen Boyce. Henrietta named Anthony Ribaudo as trustee of the family trust; and in the event Ribaudo resigned, designated defendant, Snyder, as successor trustee.

For years, plaintiff, Boyce, and defendant, Snyder, were close personal friends and business associates; and Boyce, an attorney, represented Snyder in legal matters. Snyder began working in the family grocery store as a teenager. In 1962, at the age of 22, he acquired his first ownership interest in a grocery store. He later formed Arnold Discount Foods, Inc. (hereinafter "ADF"), a corporation that owned and operated several small grocery stores. He converted the stores to Save–a–Lot stores, which were part of a chain of discount grocery stores. He also bought grocery stores which had failed or were failing. In 1983, he acquired a store in Eureka, Missouri, forming a second corporation, Eureka Discount Foods, Inc. (hereinafter "EDF"), to own and operate the store as a Save–a–Lot store (hereinafter "Eureka store"). After 1983, Snyder opened additional Save–a–Lot stores and placed them in ADF corporation.

Snyder was also an owner and director of First Exchange Bank (hereinafter "the bank"), which failed and was taken over by the FDIC. At Snyder's urging, Boyce had placed several loans with the bank. After the bank's failure, the FDIC called Boyce's loans. When Boyce was unable to obtain financing elsewhere, the FDIC obtained a judgment against him.

In the fall of 1994, Boyce met with Snyder several times to discuss Boyce's financial problems. During the meetings, Boyce learned that Snyder was interested in selling the Eureka store. Snyder's reasons for selling the Eureka store, as stated

by him, were that he wanted to lessen his workload, to reduce the number of stores he owned, and to work with his son under only one corporation, ADF.

Boyce expressed an interest in purchasing the Eureka store not only as an investment opportunity for the family trust but also as a way of providing a job for his son, Daniel. Boyce expressed concern to Snyder, however, that neither he nor Daniel had any experience in the grocery business. Snyder assured Boyce that Daniel could be trained to operate the store. Snyder and Boyce were both aware that a Wal–Mart super center was planning to open in Eureka.

Snyder provided Boyce with the past financial records for the Eureka store and introduced him to Save–a–Lot executives. The Save–a–Lot representatives told Boyce that the stores were so easy to run that a "chimpanzee could run one." On the basis of their experience, they predicted that the opening of the Wal–Mart super center would cause an initial drop in sales of ten to 15 percent, but that the Eureka store would recover the loss within six months. Snyder concurred in that opinion.

Boyce determined that the family trust should purchase the Eureka store and agreed with Snyder on a purchase price of $403,000.00. The sale was structured as a sale of the common stock of EDF, so that Snyder could offset the capital gain from the sale of the store against the capital loss he incurred when the bank failed. No date was set for closing. Boyce agreed to close when Snyder felt that Daniel was sufficiently trained to operate the Eureka store successfully.

In January 1995, Daniel began working at one of Snyder's stores located in Fenton, Missouri. Snyder told his general

plaintiffs will be referred by their first names.

manager to train Daniel to take over the Eureka store. The Fenton store manager started Daniel at an entry level position and after two months moved him into a management trainee program when he became aware that he was training Daniel to take over the management of the Eureka store. In May 1995, Daniel continued his training at the Eureka store under Bob Heaton, the manager of the Eureka store who had been interested in purchasing the Eureka store but had decided against it. Snyder's general manager continued to monitor Daniel's training several times per week and told Daniel to contact her whenever necessary. Daniel was also free to contact the manager of the Fenton store for guidance. Heaton and Daniel, however, did not get along. Heaton eventually left employment at the Eureka store at Daniel's request. Daniel was left to manage the Eureka store on his own, with occasional help from Snyder and his two managers. Snyder's own store managers had years of experience in the grocery business before they were promoted to store manager.

The Wal–Mart super center was scheduled to open in the mid-summer of 1995. Snyder was anxious to close on the sale of the Eureka store. In May 1995, Snyder told Boyce that Daniel was ready to manage the Eureka store. Boyce relied on Snyder's representation in deciding to proceed with the closing. When the purchase of the Eureka store was proposed to the trustee of the family trust, Anthony Ribaudo, he resigned as trustee because he did not have any experience in the grocery business. As the designated successor trustee, Snyder agreed to serve as trustee.

On May 30, 1995, Snyder signed documents accepting the trustee position. On May 31, 1995, the closing on the sale of the Eureka store took place. Boyce drafted the terms of the purchase agreement, which provided as follows: $265.00 to purchase one share of EDF from Snyder and $265,000.00 to redeem the remaining shares from Snyder, with the result that the family trust owned the only share of EDF corporation; $13,000.00 to Snyder for ADF corporation to provided consulting to EDF corporation, payable in monthly installments; $125,000.00 to Snyder for a non-compete agreement to prohibit him from owning or operating a grocery store within 10 miles of the Eureka store for a period of five years, payable in monthly installments. The family trust guaranteed EDF's loan of $175,000.00 from Rockwood Bank and loaned EDF an additional $75,000.00. Snyder signed the documents for the sale and financing on his own behalf and as successor trustee of the family trust.

For the first fiscal year the Eureka store was in business, after the opening of the Wal–Mart super center, the figures reflected an average decline in sales of 17 percent per week. In addition, shortly after closing, the Eureka store's refrigeration equipment needed extensive repairs and in some cases replacement. In the fall of 1995, Snyder acquired an interest in real property within a ten-mile radius of the Eureka store, with the intent of opening another grocery store with his son. Snyder and his son formed a new limited liability company to operate the new store and opened the store in May 1998. Rockwood Bank renewed EDF's loan in August 1997, August 2000, and August 2001. At the time of trial, the family trust remained liable on its guaranty of the EDF loan; and the family trust's loan to EDF remained unpaid and had increased to $160,676.27.

In 2000, plaintiffs brought the present action against Snyder. Their petition against Snyder was in six counts: Count I for his removal as trustee; Count II for

breach of his fiduciary duty; Count III for his ultra vires acts; Count IV for avoidance of the ultra vires acts; Count V for fraudulent misrepresentation; and Count VI for imposition of a constructive trust. In their action, they sought money damages, a rescission of the sale of the Eureka store, and the imposition of a constructive trust on the proceeds of the sale of the Eureka store for the benefit of the family trust. Plaintiffs also brought one count for negligent misrepresentation (Count VII) against Moran Foods, Inc. d/b/a Save–a–Lot, Ltd.; but dismissed that count without prejudice before trial. Snyder counterclaimed, seeking indemnification from the family trust for his attorney's fees and a declaratory judgment that he was entitled to indemnification. During the pendency of this action, Snyder resigned as trustee and the court appointed Daniel as interim trustee.

After a bench trial, the court entered judgment in favor of plaintiffs and against Snyder on Count I for the removal of Snyder as trustee. On Count II for breach of fiduciary duty, the court awarded total damages of $285,000.00: $185,000.00 for the family trust's purchase of the Eureka store; and $100,000.00 for the monies loaned by the family trust, which the trial court determined was a total loss. On Count VI, the court imposed a constructive trust in the amount of $285,000.00 on the proceeds of the sale of the Eureka store. The court dismissed as moot plaintiffs' claims in Counts III, IV, and V and entered judgment in favor of plaintiffs on Snyder's counterclaims. Snyder appeals from that judgment.

In his first point, Snyder contends that the trial court erred in entering judgment in favor of plaintiffs because his challenged conduct did not amount to misrepresentations, but were merely expressions of opinion or predictions. In addition, he argues

that the conduct occurred prior to his assuming the role of trustee and that he became trustee only after the deal was fully negotiated and set for closing.

■■■ A trustee is a fiduciary of the highest order and is required to exercise a high standard of conduct and loyalty in administration of the trust. *Ramsey v. Boatmen's First Nat'l Bank of K.C., N.A.,* 914 S.W.2d 384, 387 (Mo.App. W.D.1996). Although the trustee has many duties emanating from the fiduciary relationship, the most fundamental is the duty of loyalty. *Id.* As part of this duty, the trustee is to administer the trust solely in the interest of the beneficiary. *Id.* This duty precludes self-dealing, which under most circumstances is a breach of the fiduciary duty. *Id.*

■ Here, Snyder's argument that he merely expressed opinions and predictions in lieu of misrepresentations is without merit. He was very familiar with the grocery business, having worked in the business for well over 40 years in varying capacities. During that time, he had negotiated for and purchased several failed or failing grocery stores. There was evidence that Snyder had no personal experience regarding the impact a Wal–Mart super center would have on the sales of the Eureka store, although he admitted at trial that he was concerned about the competition from a Wal–Mart super center. Yet, he assured Boyce that the decline in store sales would be minimal and would be recovered six months after the opening of the Wal–Mart super center. He also was anxious to close on the Eureka store and pushed for closing, presumably because he was worried about the increased competition from the Wal–Mart super center. At trial, he was unable to explain his eagerness to close the sale of the Eureka store. He withheld information from Boyce about the true value of the store, especially as it

faced competition from a Wal–Mart super center. Knowledge of the value of the Eureka store was particularly within his province, in light of his experience in purchasing grocery stores experiencing financial difficulty. Snyder was under a duty to inform the beneficiaries of all facts known by him so that they could make an informed decision about whether to proceed with the purchase of the Eureka store.

In addition, Snyder represented to Boyce that Daniel was ready to assume management of the Eureka store. He did this, despite the fact that Daniel did not have any prior grocery store experience and had been in a management-trainee program for less than six months. Further, his own store managers had many years of experience in the grocery business before he promoted them to managerial positions.

Finally, Snyder misrepresented his reasons for selling the Eureka store, as evidenced by his subsequent conduct. His stated motives for selling were his desire to lessen his workload, to reduce the number of stores he owned, and to work with his son under one corporation. Yet, after selling the Eureka store, he opened an additional store in violation of the noncompete agreement and even formed a new business entity to operate that store.

■ The trial court was not obligated to believe Snyder's proffered reasons for selling the Eureka store. Nor was the court required to believe Snyder about what facts were known to him at the time of closing. In a court-tried case, the court is free to disbelieve the testimony of a witness. *See Ford Motor Credit Co. v. Freihaut,* 871 S.W.2d 129, 131 (Mo.App. E.D. 1994).

Boyce testified that, had Snyder apprised him of Daniel's lack of readiness to manage the Eureka store successfully and of Snyder's true reasons for wanting to sell the Eureka store, Boyce would not have recommended that the family trust purchase the store.

Snyder's argument that the transaction was for all practical purposes completed prior to his assuming the position of trustee draws a distinction without a difference. Snyder was acting in his capacity as trustee at the time of closing the sale of the Eureka store. At that time, he had the duty not only to disclose any information relevant to the sale but also to avoid engaging in a financial transaction beneficial to his interests and detrimental to the interests of the family trust. The trial court did not err in finding that Snyder breached his fiduciary duty to the family trust. Snyder's first point is denied.

In his second point, Snyder asserts that the trial court erred in entering judgment in favor of plaintiffs because they not only consented to the transaction prior to closing but also ratified the transaction after the fact by operating the Eureka store for five years before filing the present action.

■ When a competent beneficiary who has full knowledge of the facts and of his legal rights consents to a transaction, he cannot thereafter seek redress against the trustee even though the transaction would otherwise be a breach of trust. *Ramsey,* 914 S.W.2d at 387. The consent of the beneficiary, however, does not preclude him from holding the trustee liable for a breach of trust, (1) if when he gave his consent, the beneficiary did not know of his rights and of the material facts which the trustee knew or should have known and which the trustee did not reasonably believe that the beneficiary knew or (2) if the consent of the beneficiary was induced by improper conduct of the trustee. *Id.* (citing Section 216 Restatement (Second) of Trusts). When a transaction involves a trustee, it must be fair and

open, and consent must be informed with all parties holding equal knowledge of material facts and rights and otherwise free of influence. *Ramsey,* 914 S.W.2d at 388.

Here, as discussed above, Boyce did not have full knowledge of all of the material facts and did not have knowledge equal to Snyder's. Boyce had never been involved in the grocery business, unlike Snyder who had been in the business for over 40 years. Boyce relied on Snyder's estimate of the impact of the Wal–Mart super center on the Eureka store's sales. Boyce relied on Snyder's representations that Daniel was ready to assume management of the Eureka store. Snyder was aware that his knowledge regarding the sale of the Eureka store was superior to Boyce's, yet he induced Boyce to proceed with the sale by representing that Daniel was ready to manage the store. Under these circumstances, Snyder breached his fiduciary duty to the trust.

Further, Snyder's argument that the plaintiffs' continuing to operate the Eureka store was tantamount to a ratification of the sale after the fact is specious. Plaintiffs, once they purchased the Eureka store, had no choice but to continue to operate it to protect their investment as much as possible. That conduct did not amount to ratification of the sale. Snyder's second point is denied.

In his third point, Snyder contends that the trial court erred in imposing a constructive trust on the proceeds of the sale of the Eureka store. He first argues that there was no underlying breach of fiduciary duty to warrant the imposition of a constructive trust. His second argument is that there was no evidence that there were identifiable proceeds remaining on which to impose a constructive trust. We only discuss Snyder's second claim, because it is dispositive of this point on appeal.

A constructive trust is a device employed by a court of equity to provide a remedy in cases of actual or constructive fraud or unjust enrichment. *U.S. Fidelity and Guaranty Co. v. Hiles,* 670 S.W.2d 134, 137 (Mo.App.1984). It may be imposed where, as the result of the violation of confidence or faith reposed in another, or fraudulent act or conduct of such other, the plaintiff has been deprived wrongfully of, or has lost, some title, right, equity, interest, expectancy, or benefit, in the property which, otherwise and but for such fraudulent or wrongful act or conduct, he would have had. *Id.* The plaintiff may seek to impose the constructive trust on the specific property after it has left the wrongdoer's hands, until it reaches the hands of a bona fide purchaser. *Id.* The plaintiff may also seek to impose the constructive trust on, or to trace his property into, the proceeds of the property which are in the hands of the wrongdoer. *Id.* In this latter event, the plaintiff may recover any profit or increase in value that has accrued. *Id.* The plaintiff is limited, however, to a proportionate interest in the proceeds, if other separate property is commingled with wrongfully taken property to produce the price paid for the proceeds. *Id.* The plaintiff must prove his claim, both the fact of wrongful taking and any tracing, by clear, cogent and convincing evidence. *Id.*

Snyder posits that the essence of a constructive trust is the identification of specific property or fund as the res upon which the trust may be attached. *See Blue Cross Health Services, Inc. v. Sauer,* 800 S.W.2d 72, 76 (Mo.App.1990). Plaintiffs did not allege and did not establish that any such identifiable property or fund existed to which the proceeds from the sale of the Eureka store could be traced.

The appropriate action to enforce a constructive trust is an action for

money had and received. *Campbell v. Webb*, 363 Mo. 1192, 258 S.W.2d 595, 602 (1953). Notwithstanding the fact that plaintiffs prayed for the equitable remedy of a constructive trust and for an accounting for all the proceeds of the sale, in the absence of any allegation of the existence of specific property or fund constituting the res upon which the trust might be imposed, their petition failed to invoke equity jurisdiction. *See Blue Cross*, 800 S.W.2d at 76. Nothing in the record shows that plaintiffs are entitled to more than a money judgment. The trial court erred in imposing a constructive trust on the proceeds of the sale.

■■■ Under the circumstances of this case, however, it does not follow that Snyder is entitled to a new trial because of this error. *See id.* The case was fully tried with ample opportunity for all parties to present evidence on all issues framed by the pleading. There was sufficient evidence that plaintiffs are entitled to have Snyder removed as trustee and to be awarded an amount which represented the money wrongfully taken by Snyder as a result of his breach of his fiduciary duty to the family trust. The second part of Snyder's third point is granted.

In his fourth point, Snyder asserts that the trial court erred in entering judgment for plaintiffs for money damages, because plaintiffs lacked standing to assert those claims, which could only be brought by the successor trustee.

■■■ The beneficiaries have standing to bring the equitable actions for removal of the trustee, disqualification of the successor trust, and for an accounting. *Deutsch v. Wolff*, 994 S.W.2d 561, 566 (Mo. banc 1999) (citing Restatement (Second) of Trusts, section 177, 197–199). The trustee, however, should bring the claims for money damages. *Deutsch*, 994 S.W.2d at 566. In *Deutsch*, the Missouri Supreme Court

recognized that several factors justified an exception to the general rule. *Id.* In the instant action, there are factors similar, although not identical, to those in *Deutsch* that mitigate against the application of the rule requiring the successor trustee to bring the present action. *See id.* First, Snyder was actively involved in administering the family trust during the pendency of this action. Although he resigned as successor trustee, he did so 13 months after the action began. In addition, the court required the interim trustee, who was appointed to serve during the litigation, to submit monthly income and expense reports to Snyder and any withdrawals had to be submitted to Snyder five days in advance of the proposed withdrawal. Second, Snyder denied that his conduct justified removal. Plaintiffs were required to prove their right to removal by establishing that Snyder had breached his fiduciary duty to the family trust and that the trust had been damaged. Thus, the fact issues on the legal and equitable claims were identical. Third, Snyder did not make any claim before the trial court that the proper party to assert the claim was the successor trustee, but instead undertook a defense of the legal claims on their merits, including raising affirmative defenses and pleading counterclaims. Fourth, in addition to all the beneficiaries, the family trust itself was a party-plaintiff. Fifth, the pleading alleged a breach of Snyder's fiduciary duty to the trust. Sixth, the money judgment was entered in favor of all plaintiffs, which included the family trust itself. To allow actions at law to be prosecuted with the equitable actions is also consistent with the doctrine that once equity acquires jurisdiction, it will retain it so as to afford complete justice between the parties. *Id.* at 567. Thus, under the facts of this case, the beneficia-

ries had standing to bring this action. Snyder's fourth point is denied.

In his fifth point, Snyder challenges the award of damages of $285,000.00, because the award was not supported by the evidence.

 The trial court's findings relating to actual damages are entitled to great weight on appeal and will not be disturbed unless the damages awarded are clearly wrong, could not have been reasonably determined, or were excessive. *Williams v. Williams*, 99 S.W.3d 552, 557 (Mo.App. W.D.2003). If an award of damages is within the range of the evidence, an award of a particular amount may be considered responsive even though it does not correspond precisely with the amount claimed. *Id.*

 Here, Boyce testified that the actual value of the Eureka store at the time of sale was about $150,000.00. The measure of damages for misrepresentation is the difference between the actual value of the thing sold and the value as represented. *Smith v. Tracy*, 372 S.W.2d 925, 938 (Mo.1963). The difference between the purchase price of $403,000.00 and actual value was $253,000.00. The court's award of $185,000.00 for this element of damages was within the range of the evidence.

Plaintiffs also claimed damages for the money the family trust loaned in conjunction with the Eureka store. The evidence was that at closing the family trust loaned $75,000.00 of the purchase price and throughout the years of operation the family trust loaned additional monies, with the result that the amount loaned increased to $160, 767.27. The court's award of $100,000.00 for this element of damages was within the range of the evidence. The trial court did not err in awarding damages. Snyder's fifth point is denied.

That part of the judgment imposing a constructive trust on the proceeds of the sale of the Eureka store is reversed. In all other respects, the judgment of the trial court is affirmed.

CLIFFORD H. AHRENS, P.J., and LAWRENCE E. MOONEY, J., concur.