Darryl TAYLOR–McDONALD, and
Nancy Kester, Plaintiffs–
Respondents,

v.

Phillip Gary TAYLOR, and Sheila Tay-
lor, Individually, and Phillip G. Taylor
and Sheila Taylor, as Co–Trustees of
Revocable Living Trust, dated Febru-
ary 22, 1999, Defendants–Appellants.

No. 28088.

Missouri Court of Appeals,
Southern District,
Division Two.

Jan. 10, 2008.

Motion for Rehearing and Transfer
Denied Feb. 1, 2008.

Application for Transfer Denied
March 18, 2008.

Richard L. Schnake and J. Richard Owensby, of Neale & Newman, L.L.P., Springfield, and Scott B. Stinson, of Mountain Grove, MO, for Appellants.

David R. Adair, Grant Q. Haden, and Randy R. Cowherd, of Haden, Cowherd & Bullock, L.L.C., of Springfield, MO, for Respondents.

GARY W. LYNCH, Chief Judge.

This appeal arises from an action in the Circuit Court of Wright County, wherein Respondents Darryl Taylor–McDonald and Nancy Kester ("Daughters"), the daughters of decedent Philip Taylor ("Father"),[1]

1. Father's full name was Philip Paul Taylor; and his son's name is Philip Gary Taylor.

sued their brother and sister-in-law, Gary and Sheila Taylor ("the Taylors"), both individually and as trustees of their own trust, to recover property and funds that Daughters claimed should have been theirs through inheritance from their father. The trial court entered an accounting judgment against the Taylors; impressed a constructive trust on some of the Taylors' property, including a cattle herd and the farm that their trust owns; and awarded prejudgment interest and attorneys' fees to Daughters. The Taylors assert eight points of error on appeal from the trial court's judgment. Finding merit in only one of those points, we affirm the judgment in part, reverse it in part, and remand the case with directions.

## (1) Factual and Procedural Background

The facts which led to the underlying lawsuit, as found by the trial court in its Findings of Fact included in its judgment,[2] are as follows:

Father was a lifelong resident of Pennsylvania. Gary[3] and Daughters are Father's three children by his first wife. When the children were still young, Father and his first wife ended their marriage, and Father married his second wife. The children, particularly Daughters, came to dislike the second wife as they grew older. After leaving the home in Pennsylvania, Daughters rarely ever saw Father. Darryl last visited Father in 1981, and Nancy visited in 1987 and 1998 during Father's hospitalization. Gary and Sheila customarily visited Father and his second wife for a week each year.

In November of 1997, Father's second wife became seriously ill. Sheila came to Pennsylvania to assist Father with travel to and from the hospital and other matters attending the situation. Gary was not able to come because of his employment. Later that month Father's wife died, and Gary came to Pennsylvania to be with Father and attend the funeral. Daughters did not attend the funeral nor come to see Father after his wife's death. Father had always relied on his second wife to handle the couple's personal and financial transactions, and after her death he needed help with such matters. Sheila remained in Pennsylvania to help Father with his affairs, and Gary returned home, again because he had to work.

Father executed a Power of Attorney appointing Sheila as his attorney-in-fact. The goal was to enable Sheila to more effectively assist him in dealing with his affairs. On the same day, Father had Sheila's name added to two of his bank accounts with National City Bank in Pennsylvania so that she could sign checks and assist him with paying his bills. Gary, Sheila, and Father all decided it would be in Father's best interest for him to move to Belton, Missouri to live with them, so that they could more easily take care of him. Father moved in with them on December 13, 1997, and lived with them until the last few months of his life.

At the time of his second wife's death, Father's assets included his house and a

---

Here, we refer to the son as "Gary," to avoid confusion. Further, Phillip's name was spelled with two ls in the caption and elsewhere throughout the record. We make no change to this designation in the caption, as the record is not clear regarding the correct spelling.

2. Neither Daughters nor the Taylors challenge the findings of fact included in the trial court's judgment.

3. In order to avoid confusion because of the same or similar last names, we refer to each individual family member by their first name in this opinion. No disrespect is intended.

garage in Pennsylvania, insurance policies, bank accounts, and stocks. In addition, he received pension benefits and social security benefits totaling approximately $1100 per month. Father also had a will, which was executed in 1964 and bequeathed all of his assets to his second wife, and if she predeceased him, to all three of his children in equal shares.

In February of 1998, Father and Gary sent Daughters each a letter which read in part, "this was done to reduce the amount of your father's assets that would have to enter probate court after his death where an estate and your inheritance could be tied up for several years." With each letter, they sent a gift of a check for $10,000.

Around that same time, Father opened two bank accounts with Community American Credit Union in Kansas City, Missouri, and two accounts with the Bank of Belton in Belton, Missouri, all in the joint names of Gary, Sheila, and Father.

In March, Father's sister died. Gary and Sheila traveled with Father to Pennsylvania to attend the funeral and wind up his affairs in Pennsylvania, including settling the sister's estate for which Father and Gary were co-executors. Father, Gary, and Sheila visited National City Bank in Pennsylvania and transferred money in excess of $198,000 from that bank to the joint accounts in the Bank of Belton.

In April, Father met with an attorney in Kansas City and executed a will and a revocable living trust. The will divided Father's property equally among his three children. The trust named Father and Sheila as co-trustees and provided that on his death the remainder of the trust assets should be divided equally among the three children.

Two days later, Father suffered a stroke. He was rendered unconscious for several days. His condition required weeks of hospitalization and two months in a rehabilitation facility near Belton. Nancy came to visit Father while he was in the hospital, but Darryl did not visit him.

The day after Father's stroke, while he was unconscious in the hospital, Sheila wrote a check from the joint Belton account for $7,100 to pay off a Wachovia Visa credit card bill owed by her and Gary. The next day, while Father was still mentally and physically incapacitated, Sheila used money from the joint Belton account to purchase three $30,000 certificates of deposit. One was titled to Darryl and Father jointly, one to Nancy and Father jointly, and one to Gary and Father jointly.

About two weeks later, while Father was in the hospital recovering, Sheila and Gary agreed to purchase some property in Wright County, Missouri, nicknamed the "Lakey Farm," for $150,000. That same day Sheila wrote a check for $120,000 from the joint Belton account. The purchase was completed three months later when Sheila wrote a check from the joint Belton account for $30,000. The purchase price came entirely from money derived originally from Father's accounts in Pennsylvania.

One week after agreeing to purchase the "Lakey Farm," Sheila used her Power of Attorney to sign the Warranty Deed by which Father's residence in Pennsylvania was sold. The $37,000-sale proceeds were deposited into the joint Belton account. Shortly thereafter Sheila and Gary redeemed the three $30,000 certificates of deposit purchased earlier and also deposited those proceeds into the joint Belton account.

In May, while Father was recovering in the rehabilitation facility, the Taylors closed on the sale of the "Lakey Farm." It

was titled in Gary and Sheila, as husband and wife. They did not include Father in the ownership of the property. The Taylors spent $39,000 from the joint accounts with Father on making improvements to the farm, including building a new house. They also used money from the joint accounts to purchase a tractor for $14,250 and a utility vehicle for $7,999. In preparation for Father's return home, they designed the new house with Father's care in mind. Father's stroke had left him partially paralyzed, so it was necessary for the new house to be wheelchair-accessible and otherwise appropriate for the care of an elderly incapacitated person.

On July 1, Gary, Sheila, and Father all moved into the new house. Father required constant care, including cooking, cleaning, bathing, and many other daily needs. Gary and Sheila provided for these, and took good care of Father. Some third-party in-home services were also used to assist them with Father's daily needs. Father's day-to-day expenses—and many of Gary and Sheila's as well—were paid for with money from the joint bank accounts.

In August, Gary sold off Father's 240 shares of Pfizer, Inc., which were titled in Father's name and the name of his second wife. The check for the sale proceeds was made payable to Father's revocable trust and was deposited in the joint Belton account.

In February of 1999, Sheila and Gary, by quit claim deed, transferred the "Lakey Farm" to themselves as co-trustees of their revocable living trust dated February 22, 1999.

In November, Father began receiving distributions from the $99,470.46 he inherited from his sister. The first distribution was deposited in the joint account in Kansas City. The remaining distributions were deposited in the joint Belton account.

In February of 2000, Gary and Sheila closed the joint account in Kansas City and deposited the balance, $53,090.96, into their personal checking account.

On January 1, 2001, Father fell and broke his hip. While in the hospital he suffered a stroke disabling him such that Gary and Sheila were unable to provide the daily care he needed. His doctors arranged for Father's transfer to a nursing home. Despite significant assets remaining in Father's original estate, the Taylors did not explore alternatives to the nursing home, including paying for nursing care at the farm. Father moved into the nursing home in late January. By that time Father had no assets of his own, Gary and Sheila having transferred all of his remaining assets to themselves. They intentionally divested Father of any interest in the various joint bank accounts for two reasons: first, so that none of his assets would be subject to payment or recoupment for his nursing care; and second, so that there would be no estate or trust assets. The cost of Father's care in the nursing home was borne entirely by the Medicare program.

Father died on April 29, 2001. Gary and Sheila filed the 1998 will with the Probate Division of the Circuit Court of Wright County. One of them testified before the court that Father died leaving no assets.

During the time span that Father lived with Gary and Sheila, they took control of all of Father's assets, amounting to more than $428,000, and spent most of the money for their own benefit. Among those benefits which are directly traceable to Father's assets are the payment of the Wachovia Visa account, on which they had paid $16,448.57 by the time Father died; the purchase of the "Lakey Farm" and its improvements; the purchase of cattle; and

the purchase of the tractor and utility vehicle. Gary and Sheila also made "loans" to their three children from the joint accounts, only a small portion of which were repaid. Their children were the only grandchildren of Father to receive loans or gifts.

In March of 2003, Daughters filed a petition with the Circuit Court of Wright County naming Gary and Sheila as defendants individually, and as co-trustees of their revocable living trust created in February of 1999. Count I alleged conversion by Gary and Sheila of more than $340,000 of Father's personal property, of which each Daughter claimed she was entitled to a 1/3 share upon Father's death. Count II alleged the Taylors breached a fiduciary duty to Father and Daughters resulting in unjust enrichment to the Taylors, and requested the court to impose a constructive trust upon Father's property that was transferred to the Taylors. Count III alleged the Taylors tortuously interfered with Daughters' expectancy in Father's assets. Count IV requested the court to order the Taylors to provide an accounting of Father's assets. Count V alleged unjust enrichment by the Taylors through their retention of Father's assets, portions of which Daughters were entitled to receive.

The Taylors filed a counterclaim, alleging promissory estoppel due to their reliance on Father's alleged promise to compensate them for taking care of him, and requesting a set-off against any judgment that may be entered against them for the value of the services they provided to Father at his request.

The trial court sustained the Taylors' motion for judgment on the pleadings as to Daughters' claim of conversion under Count I. A three-day hearing was held on the remaining claims in December of 2005. In its judgment entered July 21, 2006, the trial court found in favor of Daughters on Count II and imposed a constructive trust on the Taylors' property held in their February 1999 trust, including the cattle herd, tractor and utility vehicle, and the "Lakey Farm." The court also found in favor of Daughters on Count IV, granting their request for an accounting and entering judgment against the Taylors for $285,333, in addition to $108,699.55 for prejudgment interest and $971.10 for court costs. The court also entered judgment against Sheila for $25,000 for Daughters' reasonable attorneys' fees under section 404.717, RSMo Cum.Sup.2006. The court found in favor of the Taylors on Counts III and V. As to the Taylors' counterclaims, the court found in favor of Daughters on the claim for promissory estoppel, but awarded the Taylors a set-off against the judgment in the amount of $41,000 for the value of care and services provided by them to Father.

Following a hearing, the trial court entered an order denying the Taylors' Motion to Amend Judgment or For a New Trial on October 20, 2006. This appeal followed.

### (2) Standard of Review

In a constructive trust case, as in other court-tried matters, we will affirm the judgment of the trial court unless there is no substantial evidence to support it, it is against the weight of the evidence, or it erroneously declares or applies the law. *Murphy v. Carron*, 536 S.W.2d 30, 32 (Mo. banc 1976); *Ruestman v. Ruestman*, 111 S.W.3d 464, 486–87 (Mo.App.2003). "To establish a constructive trust, an extraordinary degree of proof is required. The evidence must be unquestionable in character. The evidence must be so clear, cogent, and convincing as to exclude every reasonable doubt in the mind of the trial court." *Williams v. Walls*, 964 S.W.2d 839, 842 (Mo.App.1998) (quoting *Rackley v. Rackley*, 922 S.W.2d 49, 51 (Mo.App.

1996)). "This Court will also defer to the trial court on factual issues because it is in a better position to not only judge the credibility of witnesses directly, but also their sincerity and character as well as other trial intangibles which may not be completely revealed by the record." *Williams,* 964 S.W.2d at 842 (quoting *Tichenor v. Vore,* 953 S.W.2d 171, 174 (Mo. App.1997)). All fact issues upon which no specific findings were made will be considered as having been found in accordance with the result reached. *Miller v. Miller,* 872 S.W.2d 654, 657 (Mo.App.1994).

### (3) Discussion

The Taylors assert eight points on appeal challenging the court's award of the constructive trust, the accounting, prejudgment interest, and attorneys fees. For ease of analysis, we will take the points out of order and address the points relating to the constructive trust first.

### (a) Constructive Trust

■ In Point IV, the Taylors assert the trial court erred in impressing a constructive trust upon the farm and other property to secure Daughters' claimed inheritance expectancy, because Daughters had an adequate remedy at law through probate proceedings. The Taylors argue that Daughters should have been required to pursue their available remedies through the probate process before seeking to obtain assets through an equity action filed with the circuit court. They argue that by allowing Daughters to "circumvent" the probate process, the circuit court "frustrated the goals of the Probate Code," including administrative requirements, time limits, and provisions for notice to creditors. We disagree.

■ In a suit to establish a constructive trust, the plaintiff is not required to prove the inadequacy of the remedy at law and is "able to elect freely between the relief which the law can give him and the constructive trust remedy." 472 BOGERT TRUSTS & TRUSTEES 37–40 (2d ed.1978). *See also Matter of Estate of Dean,* 967 S.W.2d 219, 223–24 (Mo.App.1998); *Clay v. Walker,* 6 S.W.2d 961, 967 (Mo.App.1928) (disapproved of on other grounds by *Steele v. Cross,* 366 S.W.2d 434 (Mo.1963)). Our Supreme Court in *McHenry v. Brown,* 388 S.W.2d 797, 803–04 (Mo.1965), stated:

> The allegations of Count VII of plaintiff's petition are to establish a constructive trust.... Counts I, II and V ... are also for the establishment of a constructive trust. Plaintiff did not plead her case upon the theory that deceased owed her money, an obligation from his estate.
>
> . . .
>
> The claims in all of the submitted counts of the petition are in effect that deceased had in his possession certain properties belonging to plaintiff and not belonging to him, and which were not a part of his estate and to establish a trust thereof. In addition, plaintiff asks that title be quieted to her interest in the real estate as found. In that situation jurisdiction to hear all the claims was in the circuit court, and plaintiff was not required to file a copy of her claims in the probate court within nine months from the notice of letters of administration. *Orr v. St. Louis Union Trust Co.,* 291 Mo. 383, 236 S.W. 642, 649; *Hess v. Sandner,* 198 Mo.App. 636, 198 S.W. 1125, 1126, et seq.; *Strumberg v. Mercantile Trust Company,* Mo., 367 S.W.2d 535, 538.

Similar to the plaintiff in *McHenry,* in this case Daughters are not claiming that Father owed them money, an obligation due from his estate, but rather seek to establish a constructive trust upon the property in the Taylors' possession which

Daughters claim belongs to them and was unlawfully appropriated by the Taylors. *See McHenry,* 388 S.W.2d at 803; *Clay,* 6 S.W.2d at 967. Although this claim could be asserted in the probate court, for example through a discovery of assets action, "the inherent jurisdiction of our circuit courts to establish, declare and enforce trusts may certainly not be foreclosed by probate jurisdiction or proceedings." *Mathews v. Pratt,* 367 S.W.2d 632, 637 (Mo.1963). Missouri precedent clearly establishes that circuit courts have concurrent jurisdiction with the probate courts over actions in equity to determine the ownership of assets. *Jarman v. Eisenhauer,* 744 S.W.2d 780, 782 (Mo. banc 1988); *Robertson v. Robertson,* 15 S.W.3d 407, 420–21 (Mo.App.2000); *Dean,* 967 S.W.2d at 223–24; *Higgins v. McElwee,* 680 S.W.2d 335, 340 (Mo.App.1984). Accordingly, Daughters were not required to pursue their available probate remedies before seeking a constructive trust in the circuit court, and the circuit court appropriately exercised its jurisdiction in awarding them a constructive trust over the Taylors' property. Point IV is denied.

■ In Point V, the Taylors contend alternatively to Point IV that the trial court acted against the weight of the evidence in imposing a constructive trust upon the Taylors' entire cattle herd. They argue that there is a conflict in the record between the oral testimony and the documentary evidence, and that the overwhelming weight of the documentary evidence shows that they did not use any of Father's money to purchase the cattle, or at least that they only purchased eleven head of cattle with his money and not the entire herd.

■ "A judgment should be set aside as being against the weight of the evidence only with caution and with a firm belief that the judgment is wrong." *Pepsi Mi-*damerica v. Harris, 232 S.W.3d 648, 652–53 (Mo.App.2007). "In a court-tried civil case it is the court's duty to judge the credibility of the witnesses and the weight to be given to their testimony. The judge is free to believe none, part, or all of the testimony and chooses between conflicting evidence. We defer to these determinations." *Bonney v. Envtl. Eng'g, Inc.,* 224 S.W.3d 109, 125 (Mo.App.2007) (internal citations omitted).

■ "In order to obtain a constructive trust the plaintiff must identify specific property as the res of the trust to which he is entitled." 471 Bogert Trusts & Trustees 9 (2d ed.1978). *See also Wier v. Kansas City,* 356 Mo. 882, 204 S.W.2d 268 (Mo.1947); *Blue Cross Health Servs., Inc. v. Sauer,* 800 S.W.2d 72, 76 (Mo.App.1990). "The plaintiff may seek to impose the constructive trust on the specific property after it has left the wrongdoer's hands, until it reaches the hands of a bona fide purchaser. The plaintiff may also seek to impose the constructive trust on, or to trace his property into, the proceeds of the property which are in the hands of the wrongdoer." *John R. Boyce Family Trust v. Snyder,* 128 S.W.3d 630, 638 (Mo.App. 2004) (internal citations omitted). "In this latter event, the plaintiff may recover any profit or increase in value that has accrued. The plaintiff is limited, however, to a proportionate interest in the proceeds, if other separate property is commingled with wrongfully taken property to produce the price paid for the proceeds." *Id.* "The plaintiff must prove his claim, both the fact of wrongful taking and any tracing, by clear, cogent and convincing evidence." *Id.*

In this case, the trial court imposed a constructive trust upon the Taylors' "Black Angus cattle herd." The record reveals that Gary testified in his deposition that the $7,100.00 payment from the joint Bel-

ton account to the Wachovia credit card the day after Father's stroke was for the purchase of the first eleven Angus cattle. He further stated in his deposition, and again at trial, that he used a convenience check on the Wachovia credit account to pay for the cattle.

The Taylors now argue that the documentary evidence proves the $7,100 Wachovia payment could not have been for cattle, because the chronology of dates for the warranty deed and for the checks written to purchase the farm shows the Taylors did not own the farm when they made the $7,100 payment. The check for the Wachovia payment was dated April 6, 1998. The checks for the purchase of the farm were written later, on April 19 and July 29, 1998. The warranty deed was dated May 2, 1998, and was recorded May 4, 1998. The Taylors moved onto the farm on July 29, 1998. Consequently, they argue, at the time Sheila wrote the check to Wachovia on April 6, the Taylors did not own a farm on which to put the cattle. They also point to Sheila's trial testimony that none of Father's money was used to purchase cattle and that the $7,100 Wachovia payment was for her and Gary's personal expenses.

The trial court was free to believe all or none of the above-referenced testimony and documentary evidence. *Bonney,* 224 S.W.3d at 125. Its judgment imposing a constructive trust on the cattle herd is supported by Gary's deposition and trial testimony that the $7,100 payment from the joint Belton account to the Wachovia credit account was for the purchase of the first eleven head of cattle, and we must defer to the court's finding of credibility in that evidence. *Id.* That evidence traces the $7,100 wrongfully taken from Father into the specifically identified herd of cattle and supports the imposition of the constructive trust over the herd. *Wier,* 204

S.W.2d 268; *Boyce,* 128 S.W.3d at 638; *Blue Cross,* 800 S.W.2d at 76. Based upon the record before it, the trial court could have reasonably inferred that the cattle were purchased in anticipation of keeping them on the Lakey Farm once Gary and Sheila moved there and that they either took delivery of the cattle at a later date after their purchase or kept them at some other location until they moved to the farm. Likewise, based upon the record, the trial court could have reasonably inferred that the entire current herd consisted of these original eleven head of cattle and their subsequent offspring. Consequently, the trial court did not err in imposing the constructive trust upon the entire herd because Daughters are entitled to any increase in value that has accrued in the property. *John R. Boyce Family Trust,* 128 S.W.3d at 638. Point V is denied.

### (b) Accounting

In Point I, the Taylors contend the trial court abused its discretion in ordering an equitable accounting, because there was no fiduciary relationship between Daughters and the Taylors, and Daughters had an adequate remedy at law through probate proceedings. They argue that two of the required elements for an award of an equitable accounting include: (a) the existence of a fiduciary relationship; and (b) the inadequacy of legal remedies; and Daughters failed to prove these two elements. It is true that these are two of the elements required to award an accounting when the trial court does not otherwise have equitable jurisdiction. *In re Morrison,* 987 S.W.2d 475, 481 (Mo.App. 1999). However, a trial court may award an equitable accounting in conjunction with the establishment of a constructive trust. 472 BOGERT TRUSTS & TRUSTEES 61–62 (2d ed.1978). *See also Bernsee v. Robinson* 233 S.W. 173, 174–75 (Mo.1921); *Skidmore*

*v. Back,* 512 S.W.2d 223, 232–33 (Mo.App. 1974).

In this case, the trial court found:

Count IV of plaintiffs' petition prays for an accounting. Since Plaintiffs have prevailed on [C]ount II for the equitable relief of a constructive trust, they are entitled to an accounting to make a final determination of the disposition of [Father's] assets appropriated by Defendants. "When a court of equity once acquires jurisdiction of a cause it will not relax its grip upon the rest [sic] until it shall have avoided a multiplicity of suits by doing full, adequate and complete justice between the parties." *Skidmore v. Back,* 512 S.W.2d 223.

As we have already discussed, the trial court did not err in establishing a constructive trust over the Taylors' property. Consequently, Daughters were entitled to an accounting, in conjunction with that constructive trust, for a determination of the proper debits and credits to be charged to the Taylors. 472 BOGERT at 61–62; *Skidmore,* 512 S.W.2d at 232–33. The trial court did not abuse its discretion in awarding the accounting. Point I is denied.

In Point II, the Taylors allege the trial court erred in entering judgment in favor of Daughters personally through an accounting under section 404.727, RSMo

2000, because Daughters had no standing to seek relief personally under that statute.[4] The Taylors argue that this statute does not confer standing on individuals to recover personally, but only "to initiate the proceeding" on behalf of the principal. They also argue that according to subsection two under the statute, "[b]ecause an accounting under [404.727] is intended to benefit 'all creditors and distributees of a deceased principal's estate,' any judgment entered pursuant to the accounting must be in favor of the estate."

We do not need to reach this issue because, as we have already found under Point I, Daughters were entitled to an accounting in conjunction with the establishment of the constructive trust, in order to fully determine the disposition of Father's assets.[5] Accordingly, Point II is denied.

In Point III, the Taylors contend alternatively to Point II that the trial court erred in entering judgment against both Gary and Sheila, jointly and severally, under section 404.727, because only Sheila had a power of attorney from Father that would give rise to an accounting claim under that statute. They argue that the trial court erroneously applied the law because the evidence does not support a judgment against Gary under the statute,

4. The relevant portion of the statute reads:

1. The principal may petition the court for an accounting by the principal's attorney in fact or the legal representative of the attorney in fact. If the principal is disabled, incapacitated or deceased, a petition for accounting may be filed by the principal's legal representative, an adult member of the principal's family or any person interested in the welfare of the principal.

2. Any requirement for an accounting may be waived or an accounting may be approved by the court without hearing, if the accounting is waived or approved by a principal who is not disabled, or by a principal

whose legal capacity has been restored, or by all creditors and distributees of a deceased principal's estate whose claims or distributions theretofore have not been satisfied in full. The approval or waiver shall be in writing, signed by the affected persons and filed with the court.

5. Furthermore, the language of the trial court's judgment does not state that the court awarded the accounting under section 404.727. Rather, the court's conclusions of law incorporated into the judgment state that the accounting was awarded in conjunction with the constructive trust.

"because Gary never had or exercised [Father's] power of attorney."

We have already found under Point I that Daughters were entitled to an accounting because of the establishment of the constructive trust; it was not a statutory remedy. Thus, it does not matter that only Sheila was father's attorney in fact. In awarding the constructive trust, the trial court found that both Sheila and Gary had a fiduciary relationship with father, which they breached when they exerted undue influence to appropriate all of his assets. The court found:

> Obviously Sheila had a fiduciary relationship since she was [Father's] attorney in fact. She also had a confidential relationship as his daughter-in-law and one who offered to help him with his financial and personal affairs on the death of his wife. Gary also helped [Father] with his personal and financial affairs and took him into his home in Missouri to better assist him. He also assisted Sheila in her duties as attorney in fact in handling [Father's] assets. Both defendant's [sic] had a confidential and fiduciary relationship with [Father].

Gary and Sheila stood on equal footing in their relationship with Father as his fiduciaries, which relationship was not based merely on Sheila's power of attorney, but on the actions of Gary and Sheila in assuming the responsibility of caring for Father until his death. The constructive trust was based upon the breach by both Sheila and Gary of that relationship, and the accounting was awarded in conjunction with the constructive trust. Accordingly, it was not erroneous to enter the accounting judgment against both Sheila and Gary. Point III is denied.

### (c) Prejudgment Interest

In Point VII, the Taylors contend the trial court erred in awarding prejudgment interest against Gary and Sheila jointly and severally, because: (a) Daughters did not have a liquidated claim against Gary and Sheila authorizing an award of prejudgment interest under section 408.020, RSMo 2000; and (b) if Daughters had a claim under section 404.717, RSMo 2000, the award against Gary is unsupported by the evidence because Gary was never Father's attorney in fact. The Taylors argue that "any award of interest must rest upon either a statute or an express or implied contract," citing to *A.G. Edwards & Sons v. Drew,* 978 S.W.2d 386, 396 (Mo. App.1998). While that is true in actions at law such as the claim for breach of contract in *A.G. Edwards,* in equitable actions the decision whether to award prejudgment interest lies entirely in the trial court's discretion. *Bruner v. Workman Oil Co.,* 78 S.W.3d 801, 805–06 (Mo.App. 2002); *21 West, Inc. v. Meadowgreen Trails, Inc.,* 913 S.W.2d 858, 872 n. 7 (Mo. App.1995). Thus our review of the trial court's award is only for an abuse of discretion. *William H. Pickett, P.C. v. American States Family Ins. Co.,* 857 S.W.2d 309, 311 (Mo.App.1993).

Citing to *Leggett v. Missouri State Life Ins. Co.,* 342 S.W.2d 833, 932 (Mo. banc 1960), the Taylors argue in their reply brief that in equity the trial court's discretion is to decide whether a party is "entitled to interest at all," but once it has decided to award prejudgment interest, "it may do so only under the conditions in which the statute authorizes it." Thus, they argue, in equity "prejudgment interest may be awarded only on liquidated claims [pursuant to section 408.020]." *Leggett* does not support this proposition.

Although the trial court in *Leggett* was sitting in equity, the accounting proceeding involved rights under a written contract between the parties. *Id.* at 931. The question in *Leggett* was whether the equi-

table discretion to award interest extended to include the discretion to set a *rate* of interest different from that set forth in section 408.020. *Id.* The court held that the policyholder plaintiffs came "strictly and precisely within the terms of [section] 408.020" because they "were creditors entitled to moneys due and payable ... under a written contract in which no rate of interest was agreed upon." *Id.* The court determined, therefore, that a circuit court sitting in equity over an accounting proceeding involving rights under a written contract cannot exercise discretion in fixing the *rate* of interest and is bound to award the statutory rate of interest under section 408.020. *Id.*

■ The limited holding from *Leggett* is not applicable to the case at bar because no contract existed between the Taylors and Daughters which would bring them under the terms of section 408.020 as to the rate of interest. The trial court's decision to award prejudgment interest in this case was completely discretionary. *Bruner,* 78 S.W.3d at 805–06. "The theory of interest in any case is compensation for the use or loss of the use of money to the person entitled to it." *Pickett,* 857 S.W.2d at 312 (quoting *Laughlin v. Boatmen's Nat'l Bank of St. Louis,* 354 Mo. 467, 189 S.W.2d 974, 979 (Mo.1945)). In this case both Gary and Sheila caused Daughters to lose the use of a substantial amount of money for many years following Father's death, which should have been theirs upon inheritance through Father's will in 2001. In this equity action, the trial court did not abuse its discretion in awarding Daughters prejudgment interest. Point VII is denied.

### (d) Attorneys' Fees

■ In Point VIII, the Taylors contend the trial court abused its discretion in awarding $25,000 in attorneys' fees against Sheila under section 404.717.5, RSMo 2000, because the award was against the weight of the evidence, in that Sheila used the power of attorney only to pay Father's bills and to execute deeds to complete the closing of his real estate in Pennsylvania, and the amount of the award is unreasonable given the dollar amount of the transactions Sheila conducted under the power of attorney.

Section 404.717.5, RSMo 2000 reads, in pertinent part:

As between the principal and any attorney in fact or successor, if the attorney in fact or successor undertakes to act, and if in respect to such act, the attorney in fact or successor acts in bad faith, fraudulently or otherwise dishonestly ... and thereby causes damage or loss to the principal or the principal's successors in interest, such attorney in fact or successor shall be liable to the principal or to the principal's successors in interest, or both, for such damages, together with reasonable attorney's fees, and punitive damages as allowed by law.

In order to receive an award of attorney's fees under this section, Daughters were required to prove that Sheila acted "in bad faith, fraudulently or otherwise dishonestly." *Antrim v. Wolken,* 228 S.W.3d 50, 54–55 (Mo.App.2007).

In its conclusions of law incorporated into the judgment, the trial court found Sheila breached her fiduciary duty as Father's attorney in fact when she violated the "prudent person" standard from section 404.714, RSMo Cum.Supp.2005. The statute reads, in pertinent part:

An attorney in fact who elects to act under a power of attorney is under a duty to act in the interest of the principal and to avoid conflicts of interest that impair the ability of the attorney in fact so to act. A person who is appointed an

attorney in fact under a power of attorney, either durable or not durable, who undertakes to exercise the authority conferred in the power of attorney, has a fiduciary obligation to exercise the powers conferred in the best interests of the principal, and to avoid self-dealing and conflicts of interest, as in the case of a trustee with respect to the trustee's beneficiary or beneficiaries; and in the absence of explicit authorization, the attorney in fact shall exercise a high degree of care in maintaining, without modification, any estate plan which the principal may have in place, including, but not limited to, arrangements made by the principal for disposition of assets at death through beneficiary designations, ownership by joint tenancy or tenancy by the entirety, trust arrangements or by will or codicil. Unless otherwise provided in the power of attorney or in a separate agreement between the principal and attorney in fact, *an attorney in fact who elects to act shall exercise the authority granted in a power of attorney with that degree of care that would be observed by a prudent person dealing with the property and conducting the affairs of another* [.]

Section 404.714.1, RSMo Cum.Supp.2005 (emphasis added).

The trial court found that Sheila failed to keep Father's property separately identified and distinct from her own, when she transferred funds from Father's account into joint accounts with herself and Gary. *See Williams v. Walls*, 964 S.W.2d 839, 847 (Mo.App.1998) (Under the "prudent person" standard from section 404.714, attorney in fact is required to keep her property separately identified and distinct from the property of the principal).

In addition, the trial court found that Sheila violated her fiduciary duties under section 404.710.6, RSMo 2000, which states that no power of attorney may be construed to grant an attorney in fact the authority to make a gift of the principal's property unless expressly authorized in the power of attorney. Section 404.710.6(3), RSMo 2000; *Williams*, 964 S.W.2d at 847–48 ("As a general rule, a 'gift by an attorney in fact to himself or a third party is barred absent a clear intent to the contrary evidenced in writing.' "). The court found Sheila violated this rule by making payments to the Wachovia credit card, purchasing the farm and implements and making improvements to the farm all with the money from the joint accounts with Father. The loans made to her children and the transfers from the joint accounts into her personal accounts with Gary in the last few months of Father's life also violated this rule. The court found that regardless of the Taylors' claim they had Father's permission, none of these transactions were "expressly authorized" for purposes of the statute.

The Taylors' argument on appeal that for all of these transactions Sheila was not acting in her capacity as attorney in fact but as an authorized joint owner of the bank accounts, ignores her fiduciary duties to Father to act prudently as his attorney in fact. Section 404.714.1. "Prudent" has been defined as "capable of directing or conducting oneself wisely and judiciously; morally or intellectually disciplined; cautious, circumspect, or discreet, as in conduct, choice of ends, or business management; not rash or ill advised; highly sensible; often frugal; provident." *Williams*, 964 S.W.2d at 847 n. 12 (quoting *Conroy v. St. Joseph Ry. Light, Heat & Power Co.*, 345 Mo. 592, 134 S.W.2d 93, 95 (1939)). Fiduciaries "are held to the highest amount of loyalty and good faith, are required to exclude all selfish interest, are prohibited from putting themselves in positions where personal interest and rep-

resentative interest will conflict, and must, in any direct dealing with the principal, make full disclosure of all relevant facts and give [him] the opportunity to obtain independent advice." 481 BOGERT 275. Sheila may have been a joint owner on the accounts, but the accounts contained only Father's money. Sheila certainly did not act prudently when she made numerous gifts of Father's money to herself and her children without express written authorization, and commingled Father's funds with her own personal funds while Father lay incapacitated in the hospital. The trial court's finding that Sheila acted fraudulently for purposes of section 404.717.5 is supported by the evidence, and the trial court did not err in making the award of attorneys' fees.

Additionally, the award of $25,000 is not unreasonable given the length and complexity of the lawsuit, the large monetary value of the property involved, and the resulting judgment against the Taylors. *LPP Mortgage, Ltd. v. Marcin, Inc.*, 224 S.W.3d 50, 56 (Mo.App.2007) ("In awarding attorney fees, trial courts 'should consider the time spent, nature and character of services rendered, nature and importance of the subject matter, degree of responsibility imposed on the attorney, value of property or money involved, degree of professional ability required and the result.' "). The trial court did not abuse its discretion in awarding that amount. *Id.* Point VIII is denied.

### (e) Tracing of Funds

■ In Point VI, the Taylors contend the trial court erred in placing a constructive trust upon the farm, cattle herd, tractor, and utility vehicle for the total value of the court's judgment of $379,003.65, because Daughters did not trace the full amount of the judgment into the constructive trust property. The Taylors argue that a constructive trust may only be imposed if funds can be traced to the specific property involved or its proceeds, and Daughters only traced $215,869 overall and $193,620 into the farm, thus the constructive trust award for the entire judgment was unsupported by the evidence.

■ The trial court's judgment of $379,003.65 includes: (a) the judgment of $285,333 entered against the Taylors pursuant to the accounting, in addition to prejudgment interest in the amount of $108,699.55 and court costs of $971.10, *less* the setoff granted to the Taylors for $41,000; *plus* (b) the $25,000 attorneys' fee award against Sheila. The court separately imposed a constructive trust upon the farm, the Black Angus cattle herd, tractor, and utility vehicle, ordering that the property "shall be sold and any monies collected therefrom shall be credited against any legal relief provided in this judgment." The issue presented for our consideration is whether the court erred in using the constructive trust upon the specified items as a lien for the total amount of the judgment.

A constructive trust is a device employed by a court of equity to provide a remedy in cases of actual or constructive fraud or unjust enrichment. *U.S. Fidelity and Guaranty Co. v. Hiles*, 670 S.W.2d 134, 137 (Mo.App.1984). It may be imposed where, as the result of the violation of confidence or faith reposed in another, or fraudulent act or conduct of such other, the plaintiff has been deprived wrongfully of, or has lost, some title, right, equity, interest, expectancy, or benefit, in the property which, otherwise and but for such fraudulent or wrongful act or conduct, he would have had. *Id.* The plaintiff may seek to impose the constructive trust on the specific property after it has left the wrongdoer's hands, until it reaches the hands

of a bona fide purchaser. *Id.* The plaintiff may also seek to impose the constructive trust on, or to trace his property into, the proceeds of the property which are in the hands of the wrongdoer. *Id.* In this latter event, the plaintiff may recover any profit or increase in value that has accrued. *Id.* The plaintiff is limited, however, to a proportionate interest in the proceeds, if other separate property is commingled with wrongfully taken property to produce the price paid for the proceeds. *Id.* The plaintiff must prove his claim, both the fact of wrongful taking and any tracing, by clear, cogent and convincing evidence. *Id.*

*John R. Boyce Family Trust,* 128 S.W.3d at 638.

In order to enforce a constructive trust or lien upon property in the wrongdoer's possession, the wrongfully appropriated funds must be traced into specifically identified property as the res upon which the trust may be attached. *McHenry v. Brown,* 388 S.W.2d 797, 805–06 (Mo. 1965); *John R. Boyce Family Trust,* 128 S.W.3d at 638; *In re Wittenberg's Estate,* 577 S.W.2d 120, 122 (Mo.App.1978). The constructive trustee is personally liable only for the value of the property traced into his possession. *Campbell v. Webb,* 363 Mo. 1192, 258 S.W.2d 595, 602 (Mo. 1953). The beneficiary is entitled to enforce the constructive trust either for his proportionate share of the trust property, or as an equitable lien for the value of the traced property. *McHenry,* 388 S.W.2d at 806; *Cross v. Cross,* 362 Mo. 1098, 246 S.W.2d 801, 803 (Mo.1952); *Wittenberg's Estate,* 577 S.W.2d at 121–22.

In the case at bar, Daughters made a prima facie case for a constructive trust by showing that the Taylors wrongfully spent Father's money on certain property. As discussed under Points I and II above, the court had authority to order an accounting in connection with the constructive trust, in order to adequately determine the disposition of Father's assets. The accounting enabled the trial court to trace which property in the Taylors' possession was acquired with Father's funds and should be imposed with a constructive trust, as well as in the process discover other funds that were wrongfully spent by the Taylors but which were not traceable into any particular property in their possession. The constructive trust can only be imposed upon the specifically identified property in the Taylors' possession into which wrongfully appropriated funds were traced—in this case the farm, tractor, utility vehicle, and cattle. In order to do full equity, however, the court has the authority to also enter a money judgment for "other" funds wrongfully spent by the Taylors, but which were not traced into specific property. *See Perry v. Perry,* 484 S.W.2d 257, 259 (Mo.1972) ("It is a settled maxim that equity, once having acquired jurisdiction of a cause, will not relinquish it without doing full and effective justice between the parties, even though, to right the wrong complained of, resort must be had to a remedy within the traditional province of law, as by a judgment for money by way of restitution."); *Skidmore v. Back,* 512 S.W.2d 223, 232–33 (Mo.App.1974). Nevertheless, the court can only enforce the constructive trust for the value of the funds traced into the identified property, and not for the total amount of its judgment. *Campbell,* 258 S.W.2d at 602.

The court's judgment does not state the value of the funds traced into the constructive trust property. After separating out the awards for attorney fees, court costs, and prejudgment interest, we are left with the accounting judgment for $285,333.00. The court did not specify if that entire

amount was traced into the constructive trust property, or whether a portion of that amount was awarded as "other" damages in connection with the accounting. Viewing the evidence in the light most favorable to the trial court's judgment, the evidence shows that Daughters were able to trace $193,620.00 into the farm.[6] In addition, they traced $7,999 into the utility vehicle and $14,250.00 into the tractor. As discussed under Point V above, Daughters also traced $7,100 into the cattle herd. The remainder of the $285,333 awarded was not traced into the property constituting the constructive trust.

Daughters have a two-thirds interest in the property held by the Taylors in the constructive trust, because each of them expected to inherit one-third of Father's assets. If that interest is reduced by the trial court to a money judgment for the funds traced into the property held in the constructive trust, Daughters are also entitled to the prejudgment interest on that judgment, in compensation for their loss of use of the property. *Pickett*, 857 S.W.2d at 312. Thus, Daughters were entitled to an award of either: (1) a two-thirds share of the constructive trust property; or (2) a money judgment for the value of two-thirds of the funds traced into the property, plus interest, with a lien for that amount on the property held in such constructive trust. *McHenry*, 388 S.W.2d at 806; *Cross*, 246 S.W.2d at 803; *Wittenberg's Estate*, 577 S.W.2d at 121–22. The trial court erroneously imposed a lien on the property held by the Taylors in the constructive trust for the amount of its judgment which exceeded the amount of the funds traced into the property in the constructive trust.

Had the trial court realized that it could only enforce the constructive trust as a lien for two-thirds of the amount of the funds traced, plus interest, it might have instead awarded Daughters a two-thirds interest in the property, and entered a separate money judgment for "other" funds wrongfully spent. This is a decision that rests within the sound discretion of the trial court. In any event, the constructive trust award as a lien for the entire amount of the judgment is erroneous, and consequently the amounts of the accounting award and the prejudgment interest, the totality of which are both premised upon the efficacy of that lien, are erroneous as well.

### (4) Decision

We reverse the portion of the trial court's judgment imposing a constructive trust upon the farm, cattle, tractor, and utility vehicle as a lien for the entire amount of the judgment, reverse the award of $285,333 in connection with the accounting, reverse the award of prejudgment interest of $108,699.55, and remand to the trial court with directions to enter such judgment on these issues as it deems equitable, appropriate, and in accordance with this opinion. The trial court, in its

---

**6.** In their Appellants' Brief, the Taylors have provided a list, with citations to the record, of the funds that Daughters were able to trace into assets possessed by the Taylors. Daughters did not provide in their Respondents' Brief any evidence of their own as to the funds that they traced, which would contradict the Taylors' list. Daughters merely argue that because "the farm property necessarily has a judgment lien against it for the full amount of the judgment" pursuant to section 511.350, the Taylors' "calculations are a waste of this Court's time." The parties on appeal carry the burden of citing to evidence in support of their arguments. Missouri Court Rule 84.04(i). *See also State v. Westcott*, 121 S.W.3d 543, 545 n. 2 (Mo.App.2003). Accordingly, we will rely on the Taylors' list of traced funds because Daughters have not challenged or contradicted that list by citing their own evidence.

sound discretion, may enter its judgment on the basis of the evidence previously adduced or entertain such additional evidence as it deems appropriate. In all other respects, the judgment of the trial court is affirmed.

BARNEY, P.J., and SCOTT, J., concur.